IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| LOUIS HENDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:11cv224-MHT |
| | ) | (WO) |
| KIM THOMAS, Commissioner, | ) | |
| Alabama Department of | ) | |
| Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION AND ORDER</u>

The eight named plaintiffs (Louis Henderson, Dana
Harley, Darrell Robinson, Dwight Smith, Albert Knox,
James Douglas, Alqadeer Hamlet, and Jeffery Beyer) bring
this lawsuit on behalf of themselves and a class of all
current and future HIV+ prisoners incarcerated in Alabama
Department of Corrections (ADOC) facilities.  They
challenge ADOC's policy of segregating HIV+ inmates from
the general prison population.  They have named as
defendants ADOC Commissioner Kim Thomas and the wardens
of the four ADOC facilities that house HIV+ inmates.

The plaintiffs claim that the HIV-segregation policy discriminates against them on the basis of a disability (HIV+ status) in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question).

The case is currently before the court on the defendants' motion to dismiss.  The defendants argue that dismissal is warranted (1) because the action is barred by res judicata; (2) because the plaintiffs have failed to state a claim for which relief can be granted; (3) under the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321; and 4) on sovereign-immunity grounds. For the reasons that follow, the court denies the motion to dismiss, but sets aside the res judicata issue until a ruling on the merits.

## I. MOTION-TO-DISMISS STANDARD

In considering the defendants' motion to dismiss, the court accepts the plaintiffs' allegations as true, <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiffs' favor. <u>Duke v. Cleland</u>, 5 F.3d 1399, 1402 (11th Cir. 1993). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). A complaint satisfies the plausibility standard when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>.

## II. BACKGROUND

### A.   ADOC's HIV-Segregation Policy

Alabama law requires HIV testing for all prisoners. 1975 Ala. Code §§ 22-11A-17 & 22-11A-38.  Alabama statutory and administrative law, however, is silent on the segregation of HIV+ prisoners.  In the absence of an explicit policy, the plaintiffs point to several specific ways in which ADOC's HIV-segregation policy functions in practice. At its core, the defendants' HIV-segregation policy dictates that HIV+ inmates are housed in separated accommodations, both inter- and intra-facility, and regardless of security classification.

Alabama has five levels of prisoner classification: close-custody, medium, minimum-in, minimum-out, and minimum-community.  Security classification is a multi-factor analysis that includes an individual's criminal history, past convictions, past violence, length of sentence, and pendency of unresolved charges.  Atchison Affidavit (Doc. No. 47-1) ¶ 3.

4

Close-custody is "reserved for prisoners who have demonstrated severe behavioral problems, some prisoners sentenced to life without parole, and some detainees awaiting trial or sentencing for capital offenses." Second Amended Complaint (Doc. No. 61) ¶ 37. Medium-custody prisoners are held at medium- or close-security institutions and are housed in double-occupancy cells or dormitories. Medium-custody prisoners may receive work assignments inside a secure facility.

The "minimum" classification includes three sub-parts, all of which permit some type of work outside a secure facility. Most important for present purposes, only minimum-out and minimum-community inmates may transfer to a work-release center. Atchison Affidavit (Doc. No. 47-1) ¶ 5.

The plaintiffs allege that, despite this classification system, all HIV+ inmates are housed in four facilities. Male HIV+ inmates are housed at either Limestone Correctional Facility or Decatur Work

Release/Community Work Center.  Female HIV+ inmates are housed at either Julia Tutwiler Prison for Women or the Montgomery Women's Facility.

The centerpiece of Alabama's segregation policy is that HIV+ prisoners are housed at certain facilities and completely barred from others.  For instance, male inmates who have a six-month clear record may apply to transfer to a facility closer to their families.  Id. ¶ 13.  While no inmate has a right to transfer, HIV+ male inmates are prohibited entirely from transferring.  Thus, the male plaintiffs are barred from approximately two dozen facilities around the State.

The HIV-segregation policy is replicated within facilities.  At Limestone, all HIV+ prisoners are housed on the A-Side.  HIV+ prisoners, therefore, are excluded from the general population area in B-Side and the Faith-Based Honor Dorm in C-Side.  They are also barred from the senior dormitory in A-Side.  Limestone separates HIV+ prisoners by forcing them to wear white armbands, thereby

disclosing their health status to fellow prisoners, staff, and visitors.

Because Alabama has far fewer female inmates, it maintains only one secure institution (Julia Tutwiler Prison for Women) and two work-release facilities for women.  Within Tutwiler, HIV+ prisoners are housed in two of 15 housing units: an HIV dormitory and the healthcare unit.  Despite these differences in institutional setting, the HIV-segregation policy as applied to females mirrors the male counterpart.

The plaintiffs further allege that ADOC utilizes a discriminatory medical-clearance policy when deciding which inmates to send to work-release facilities. According to the plaintiffs, the policy forces inmates to start antiretroviral medications before their viral loads require it. Second Amended Complaint (Doc. No. 61) ¶ 86. The plaintiffs, therefore, allege discriminatory treatment in transferring male prisoners to Decatur Work

Release and female prisoners to Montgomery Women's Facility. Id. ¶¶ 89-90.

Additionally, the plaintiffs allege that ADOC's segregation policy excludes them from certain programs. HIV+ inmates, for example, are barred from the residential component of any program, such as Limestone's substance-abuse program. And by implication, the plaintiffs are barred from programs at the majority of ADOC's prisons. This includes several programs that are not available at Limestone, such as agricultural programs at J.O. Davis Correctional facility, trade schools at Staton Correctional Center, and a secular substance abuse program at Easterling Correctional facility. Id. ¶¶ 101-103. The HIV-segregation policy extends beyond residential areas and prohibits HIV+ inmates from obtaining food-service employment. Finally, the plaintiffs assert that the HIV-segregation policy results in disparate punishment and the unlawful disclosure of their medical status.

B.  Prior Litigation

Alabama first instituted its HIV-segregation policy in the 1980s, when widespread public concern over HIV/AIDS prompted the overwhelming majority of States to isolate HIV+ prisoners.  But once the sources of HIV transmission were firmly established, many States rescinded these policies.  By 1994, only six States had HIV+ segregation policies.  Today, only Alabama and South Carolina maintain a policy of isolating all HIV+ prisoners in separate housing units.

This is not the first lawsuit challenging the segregation of HIV+ prisoners in Alabama.  In 1987, prisoners challenged the segregation of recreational, religious, and educational programs under the Rehabilitation Act.  After a decade of litigation, the en banc Eleventh Circuit Court of Appeals held that HIV+ prisoners were not "otherwise qualified" under the Rehabilitation Act and that no "reasonable

9

accommodations" were required.  <u>Onishea v. Hopper</u>, 171

F.3d 1289 (11th Cir. 1999) (en banc).[1]

The Eleventh Circuit premised its ruling on an exception to § 504 of the Rehabilitation Act.  The statute excludes from its definition of an "otherwise qualified individual with a disability" those persons that have a "'currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals.'" <u>Id</u>. at 1296-97 (quoting 29 U.S.C. § 705(20)(D)).

This statutory exception codified the Supreme Court's ruling in <u>School Board of Nassau County v. Arline</u>, 480 U.S. 273 (1987).  Under <u>Arline</u>, four factors determine whether the contagious-disease exception applies:

> "[F]indings of fact, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the

_____

1.    The <u>Onishea</u> plaintiffs also brought an Eighth Amendment claim, which was rejected.

> risk (how long is the carrier
> infectious), (c) the severity of the
> risk (what is the potential harm to
> third parties) and (d) the probabilities
> the disease will be transmitted and will
> cause varying degrees of harm."

Id. at 288 (alteration in original).  In weighing these
factors, Arline instructs courts to "defer to the
reasonable medical judgments of public health officials"
when making these findings of fact.  Id.  The Arline
Court concluded that a person "who poses a significant
risk of communicating an infectious disease to others ...
will not be otherwise qualified ... if reasonable
accommodation will not eliminate that risk."  Id. at 287
n.16 (emphasis added).  Thus, the contagious-disease
exception requires courts not only to examine the risk
associated with the disease but also to make findings
about whether a reasonable accommodation can ameliorate
that risk.

In Onishea, the Eleventh Circuit, building on the
Arline test, emphasized: "In the state of medical
knowledge and art at the time of trial, HIV infection

11

inevitably progressed to AIDS.  AIDS always led to death,
often after lengthy suffering."  Onishea, 171 F.3d at
1293.  Given this premise, the court of appeals held
that, when "transmitting a disease inevitably entails
death, the evidence supports a finding of 'significant
risk' if it shows both (1) that a certain event can occur
and (2) that according to reliable medical opinion the
event can transmit the disease."  Id. at 1299.  The
Eleventh Circuit concluded that the evidence adduced at
trial established that HIV posed a "significant risk" in
the prison context.

In 1997, while Onishea was pending, another group of
HIV+ prisoners filed suit in this court, claiming that
Alabama's segregation policy violated the ADA and the
Eighth Amendment.  Edwards v. Alabama Dep't of Corr., 81
F. Supp. 2d 1242 (M.D. Ala. 2000) (Thompson, J.).  With
regards to the ADA claim, this court held that it was
identical to the Onishea plaintiffs' Rehabilitation Act
claim and was precluded under res judicata.  Id. at 1249.

12

This court noted that "nothing in [its] opinion should be taken to hold that the court has rejected the application of a changed-circumstances argument to the plaintiffs' ADA claim." Id. at 1250 n.2.

Regarding the Eighth Amendment claim, this court found res judicata inapplicable because of changed factual conditions. Id. at 1250. The Eighth Amendment claim, however, was dismissed because the plaintiffs failed to exhaust their administrative remedies under the PLRA. Id. at 1256-57.

Shortly after Edwards, a class action was brought challenging the constitutional adequacy of medical care for HIV+ inmates at Limestone Correctional Facility. A consent decree was entered in 2004 and terminated in 2006. See Settlement Agreement, Leatherwood v. Campbell, No. CV-02-BE-2812 (N.D. Ala. Apr. 29, 2004) (Bowdre, J.).

13

C.  This Suit

Eight plaintiffs brought this suit under the Rehabilitation Act and the ADA.  According to the allegations in the complaint, plaintiffs Louis Henderson, Darrell Robinson, Albert Knox, James Douglas, and Jeffery Beyer are housed at Limestone; plaintiffs Dwight Smith and Alqadeer Hamlet are housed at Decatur Work Release; and plaintiff Dana Harley is housed at Tutwiler.

The named plaintiffs are just a fraction of the approximately 260 HIV+ inmates in the Alabama prison system.  They represent a class of all prisoners diagnosed with HIV in the custody of ADOC, now and in the future.  Henderson v. Thomas, 2012 WL 3777146 (M.D. Ala. 2012) (Thompson, J.)

Five state officials are sued in their official capacities: Kim Thomas, Commissioner of the Alabama Department of Corrections; Billy Mitchem, warden at Limestone; Frank Albright, warden at Tutwiler; Bettina Carter, warden at Decatur Work Release/Community Work

Center; and Edward Ellington, warden at Montgomery Women's Facility.

The plaintiffs seek prospective relief: a declaratory judgment that the segregation policy violates the ADA and the Rehabilitation Act and an injunction against its further enforcement. The plaintiffs seek no money damages.

### III.   DISCUSSION

#### A.  Res Judicata

The defendants raise the affirmative defense of <u>res judicata</u> as a bar to the "re-litigation" of its HIV-segregation policy. <u>Res judicata</u> prohibits a subsequent action if four elements are present: "(1) a final judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits, and (4) the same cause of action must be involved in both cases." <u>Hart v. Yamaha-Parts Distributors, Inc.</u>, 787 F.2d

1468, 1470 (11th Cir. 1986).  The defendants contend that

the plaintiffs' claims under the Rehabilitation Act and

the ADA are identical to those raised in <u>Onishea</u> and

<u>Edwards</u>.

　　As described above, the same class of plaintiffs

failed in their challenges to this policy in <u>Onishea</u> and

<u>Edwards</u>.[2]  In <u>Onishea</u>, the plaintiffs brought suit under

the Rehabilitation Act and the Eighth Amendment.

────────────────────

　　2.  The defendants do not rely on the <u>Leatherwood</u>
class action for their <u>res judicata</u> argument.   <u>See</u>
Defendants' Brief (Doc. No. 35) at 12 n.5 ("While there
are reasonable grounds to conclude that the Named
Plaintiffs are collaterally estopped from bringing their
claims by virtue of <u>Leatherwood</u>, the preclusive effect of
the other actions is such that the Court need not even
consider any collateral estoppel resulting from the
<u>Leatherwood</u> matter.").   In any event, the <u>Leatherwood</u>
plaintiffs raised an Eighth Amendment claim, not a
disability claim.

　　The defendants also cite a recent 42 U.S.C. § 1983
suit brought by an HIV+ prisoner at Limestone who
challenged the prison's armband policy as a violation of
his constitutional right to privacy under the Fourteenth
Amendment.   <u>Id</u>. at 16 n.8.   The Eleventh Circuit
concluded that the defendants were entitled to qualified
immunity.   <u>Reed v. Allen</u>, 379 Fed. App'x 879 (11th Cir.
2010).   <u>Reed</u> is inapposite because, among other reasons,
it is premised on a constitutional claim.

16

Edwards, 81 F. Supp. 2d at 1246-47 (summarizing the decade-long history of the Onishea litigation).   In Edwards, the plaintiffs' claims were brought under the ADA and the Eighth Amendment. Id. at 1245.

    The plaintiffs concede that the first three elements of res judicata are satisfied.  Plaintiffs' Brief (Doc. No. 37) at 2.  The plaintiffs, however, argue that the defendants cannot meet the fourth element because of changed-factual circumstances.  Relying on Edwards, the plaintiffs argue that the "'determinative factor in ascertaining whether two causes of action are identical for res judicata purposes is not only whether the same legal claim is asserted, but also whether the factual underpinnings of the causes of action are constant.'" Id. (quoting Edwards, 81 F. Supp. 2d at 1249); see also Edwards, 81 F. Supp. 2d at 1248 ("It is now said, in general, that if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, that the two cases are

17

really the same 'claim' or 'cause of action' for purposes of <u>res judicata</u>.") (internal quotation marks omitted).

The plaintiffs contend that the "central factual premise of the <u>Onishea</u> decision--that HIV infection inevitably progresses to AIDS and then to death--is no longer true." Plaintiffs' Brief (Doc. No. 37) at 3. Since the introduction of highly active antiretroviral therapy in 1997, HIV has gradually become a "manageable chronic condition." <u>Id</u>. at 4-5. These changed circumstances, in turn, impact the "significant risk" standard for contagious diseases under the ADA and Rehabilitation Act.

Because this issue requires an examination of the past and present state of HIV treatments, this court need not address the <u>res judicata</u> issue now. As a general rule, an affirmative defense, such as <u>res judicata</u>, "will not support a [Fed. R. Civ. P.] 12(b)(6) motion to dismiss for failure to state a claim." <u>Fortner v. Thomas</u>, 983 F.2d 1024, 1028 (11th Cir. 1993). Only when

the "defense's existence can be judged on the face of the complaint" may a court grant a motion to dismiss on a <u>res judicata</u> ground.  <u>Concordia v. Bendekovic</u>, 693 F.2d 1073, 1075 (11th Cir. 1982).  If more information is necessary to adjudicate the <u>res judicata</u> defense, then the court must treat the motion "as if it were a motion for summary judgment under [Fed. R. Civ. P.] 56."  <u>Id</u>.

At oral argument on September 16, 2011, counsel for the defendants indicated that discovery related to the changed-circumstances argument was appropriate in order for the court to make an informed decision about the recent improvements in HIV treatments.  Oral Argument Transcript (Doc. No. 56) at 30-32.  The court, therefore, sets aside the <u>res judicata</u> issue for the moment and will make a ruling after the bench trial.[3]

_____

3.  Although not mentioned by either side, the court notes that Congress's recent amendments to the ADA may supply a basis for changed legal conditions. Specifically, the ADA now lists "functions of the immune system" as a major bodily function.  42 U.S.C. § 12102(2)(B).  This amendment may reflect congressional concern that diseases that affect the immune system--such

(continued...)

**B. Failure to State a Claim**

The defendants raise three Fed. R. Civ. P. 12(b)(6) arguments that the plaintiffs' complaint fails to state a claim. First, they argue that the "Plaintiffs' cursory non-descript allegations of 'discrimination'" runs afoul of the plausibility standard. (Doc. No. 35) at 22. Second, they contend that the plaintiffs have no right to be incarcerated at any particular facility. Third, the defendants submit that prisoners have no right to confidentiality relating to their HIV status.[4]

_____

(...continued)
as HIV and AIDS--merit protection under federal anti-discrimination statutes. See also infra Section III.B.1.

     4.   The defendants also argued that Governor Robert Bentley was improperly named as a defendant in this action. After an agreement between the parties at oral argument on September 16, 2011, the court dismissed Governor Bentley as a defendant. See Doc. No. 53.

### 1. The Plausibility Standard

A complaint must present "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678.  The defendants submit that the plaintiffs have failed to state sufficient facts to establish a claim under Title II of the ADA and § 504 of the Rehabilitation Act.

In the Eleventh Circuit, the "causes of action under Title II of the ADA and the Rehabilitation Act are essentially identical." <u>Everett v. Cobb County Sch. Dist.</u>, 138 F.3d 1407, 1409 (11th Cir. 1999).  The only salient difference is that a claim under the Rehabilitation Act can be brought only against a recipient of federal funding, a fact that the defendants concede.  Defendants' Brief (Doc. No. 35) at 25 n.10.

Thus, for purposes of this opinion, the court uses the two statutes interchangeably.

To state a claim under Title II of the ADA, a plaintiff must demonstrate that he "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." Waddell v. Valley Forge Dental Assoc., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (internal quotation marks omitted) (alteration in original).

Under these statutes, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). In this suit, the plaintiffs have alleged that they have an existing physical impairment that substantially limits a major-life activity. Second Amended Complaint (Doc. No. 61) ¶ 105.

A disability under the statutory scheme, therefore, is (1) a physical or mental impairment that (2) substantially limits (3) a major-life activity. An impairment is not necessarily a disability under the statutory definition; the impairment must substantially limit a major-life activity. See Adams v. Rice, 531 F.3d 936, 943-44 (D.C. Cir. 2008) (distinguishing an impairment and a disability).

Under the ADA Amendments Act of 2008, a major-life activity includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The statutory definition of major-life activities also encompasses "major bodily functions" which "includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder,

neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." Id. § 12102(2)(B) (emphasis added).

The defendants contend that the plaintiffs have not pled sufficient facts to establish that their HIV status substantially limits a major-life activity. The defendants believe that the complaint is deficient in multiple ways.

First, according to the defendants, the "Named Plaintiffs must present an individual assessment of whether HIV substantially limits a 'major life activity' of a particular plaintiff." Defendants' Brief (Doc. No. 39) at 13 (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 194 (2002)).

The complaint specifies that each named plaintiff is diagnosed with HIV. See, e.g., Second Amended Complaint, (Doc. No. 61) ¶ 16 (Henderson); Id. ¶ 32 (Harley). The complaint also provides information on the contemporary medical consensus regarding HIV treatment. Id. ¶¶ 1, 4-

24

5, 41-42.   The plaintiffs further allege that "HIV is an impairment of the immune system that substantially limits a person with HIV in one or more major-life activities. It is therefore a disability within the meaning of 42 U.S.C. § 12102(1)(A) [Title II of the ADA] and 29 U.S.C. § 705(9)(B) [Rehabilitation Act]." Id. ¶ 105.[5]   Given these allegations, it is "plausible on its face" that every one of the HIV+ plaintiffs suffers from an impairment (HIV) that substantially limits a major-life activity (the immune system).   Twombly, 550 U.S. at 570.

Second, the defendants contend that the plaintiffs have failed to plead sufficient facts that there is no "significant risk" of HIV infection if prisons are integrated.   Defendants' Brief (Doc. No. 35) at 28. Under Onishea, when "transmitting a disease inevitably entails death, the evidence supports a finding of

---

5.   The defendants concede that HIV is a physical impairment under the ADA.   See Defendants' Brief (Doc. No. 39) at 13.   At oral argument, the defendants also agreed that the complaint alleges that the "major life activity" at issue in this litigation is the immune system.   Oral Argument Transcript (Doc. No. 56) at 35.

'significant risk' if it shows both (1) that a certain event can occur and (2) that according to reliable medical opinion the event can transmit the disease." Onishea, 171 F.3d at 1299. If the plaintiffs' HIV status poses a "significant risk," they are not considered "otherwise qualified" under the statute and fall outside its protections.

At this stage of the litigation, taking the allegations in the complaint as true, the plaintiffs have demonstrated that HIV does not pose the same "significant risk" as it did in the 1990s. The court finds it significant that the Eleventh Circuit anchored its ruling on "the state of medical knowledge and art at the time of trial." Id. at 1293. In the early 1990s, "HIV infection inevitably progressed to AIDS. AIDS always led to death, often after lengthy suffering." Id. at 1293. Given this premise, the Eleventh Circuit held that when "transmitting a disease inevitably entails death, the evidence supports a finding of 'significant risk' if it

26

shows both (1) that a certain event can occur and (2) that according to reliable medical opinion the event can transmit the disease." <u>Id</u>. at 1299.

The complaint provides detailed allegations regarding the recent improvement in HIV treatments. <u>See</u>, <u>e.g.</u>, Second Amended Complaint (Doc. No. 61) ¶ 4 ("By the mid-1990s, however, new classes of antiretroviral medications proved extremely effective at suppressing the virus. <u>These medications changed HIV from a fatal disease to a chronic condition</u> that can be successfully treated.") (emphasis added). Assuming it is true that HIV no longer "inevitably entails death," <u>Onishea</u>'s heightened "significant risk" test may be undermined to the point that it no longer controls.

If <u>Onishea</u> is inapplicable, the Supreme Court's more general "significant risk" test for communicable diseases would apply. In <u>Arline</u>, the Court concluded that a person "who poses a significant risk of communicating an infectious disease to others ... will not be otherwise

**27**

qualified ... if <u>reasonable accommodation will not
eliminate that risk</u>." <u>Arline</u>, 480 U.S. 287 n.16 (emphasis
added).

The complaint pleads sufficient facts to show that
reasonable accommodations can be made to integrate HIV+
inmates.  For instance, the complaint notes that all but
two state penal systems have integrated HIV prisoners
into the general population and that the National
Commission on Correctional Health Care counsels against
segregation.  Second Amended Complaint (Doc. No. 61)
¶¶ 5-6 & 43.  The plaintiffs, therefore, have pled
sufficient facts to show that they do not pose a
"significant risk" under either <u>Onishea</u> or <u>Arline</u>.

Finally, the defendants find fault with the
plaintiffs' "cursory, non-descript allegations such as
their repeated general references to 'services, programs,
or activities.'" Defendants' Brief (Doc. No. 35) at 28.
Similarly, the defendants argue that the plaintiffs have

not pled that they are "otherwise qualified" for these
programs.

The plaintiffs provide detailed lists of the types of
programs and accommodations that they are ineligible for
solely because of their HIV status. See, e.g., Second
Amended Complaint, Doc. No. 61, ¶ 50 (Limestone senior
dorm); id. ¶ 56 (Limestone honor dorm); id. ¶ 67
(Tutwiler internal segregation); id. ¶¶ 91-103
(accommodations and programs at other ADOC facilities).
Regarding work-release, the plaintiffs claim
discriminatory placement--not, as the defendants
construe, total exclusion--and have pled sufficient facts
to survive a motion to dismiss. See id. ¶¶ 81-90. And,
as to the named plaintiffs, they have pled that they are
"otherwise qualified" for transfer and other programs.
See, e.g., id. ¶ 18 (Henderson); id. ¶ 31 (Beyer).

This complaint is not the series of "conclusory
allegation[s]" that the plausibility standard bars.
Twombly, 550 U.S. at 557.  The plaintiffs have more than

29

"nudged their claims across the line from conceivable to plausible." Id. at 570.

### 2.  Requesting a Transfer

The defendants contend that the plaintiffs have no right to transfer to new accommodations.  Within ADOC, no inmate, "regardless of HIV status, enjoys the right to demand that they be placed in the prison of their choosing."  Defendants' Brief (Doc. No. 35) at 30. Defendants also note that "a prisoner does not have a [constitutional] right to confinement in a particular penal facility." Id. at 30 (citing Sandin v. Conner, 515 U.S. 472, 478 (1995) and Meachum v. Fano, 427 U.S. 215, 225 (1976)).

The defendants misconstrue the plaintiffs' claim. The plaintiffs do not assert a constitutional right to placement in any particular facility.  Rather, the plaintiffs seek the statutory right to apply for a transfer to another facility--or within Limestone and

Tutwiler--without being discriminated against on the basis of a disability.

That is the plaintiffs' claim for relief in this suit.  ADOC policy permits inmates to request transfers to other facilities in order to be closer to home or to enroll in vocational programs. Atchison Affidavit (Doc. No. 47-1) ¶ 13. Given that the ADA and Rehabilitation Act apply to prisons, these statutory protections against disability discrimination extend to programs and accommodations at ADOC facilities.  See Pa. Dept. of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) (ADA Title II); Onishea, 171 F.3d at 1296 n.11 (Rehabilitation Act). Indeed, the "text of the ADA provides no basis for distinguishing these [correctional and rehabilitative] programs, services, and activities from those provided by public entities that are not prisons." Yeskey, 524 U.S. at 210.  Accordingly, the plaintiffs have stated a claim upon which relief can be granted.

31

### 3. Medical Privacy

The defendants submit that prisoners have no constitutional right to privacy in their HIV+ status, relying on a precedent from the <u>Onishea</u> litigation. In <u>Harris v. Thigpen</u>, 941 F.2d 1495 (11th Cir. 1991), the Eleventh Circuit assumed arguendo that prisoners maintain a right to medical privacy in their HIV status and held that Alabama's legitimate penological interest in safety outweighed any privacy right. <u>Id</u>. at 1512 & 1521.

The plaintiffs concede that the there is no independent basis for the medical-privacy claims "[i]nsofar as these disclosures only affect the prisoners' family relationships and personal well-being." Plaintiffs' Brief (Doc. No. 37) at 26. However, when the disclosure of private medical information permits disability discrimination by a private contractor, the plaintiffs have a claim under federal law. <u>See</u> 28 C.F.R. §§ 35.130(b)(1)(v) & 35.130(b)(3)(I). The complaint's allegations regarding work placement and HIV status

trigger these protections.  See Second Amended Complaint,

(Doc. No. 61) ¶¶ 84-85.


    C.  The PLRA

The defendants raise two arguments for dismissal

pursuant to the PLRA.  First, they contend that the

plaintiffs failed to exhaust their administrative

remedies.  Second, the defendants assert that the PLRA

bars the type of relief sought.


    1.  Failure to Exhaust

The PLRA mandates that, "No action shall be brought

with respect to prison conditions under section 1983 of

this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional

facility until such administrative remedies as are

available are exhausted." 42 U.S.C. § 1997e(a).  As this

is an affirmative defense, "[t]he defendants bear the

burden of proving that the plaintiff has failed to

exhaust his available administrative remedies." <u>Turner</u> <u>v. Burnside</u>, 541 F.3d 1077, 1082 (11th Cir. 2008). Although this issue is raised at the motion-to-dismiss stage, the court may look behind the pleadings and conduct fact-finding to resolve this question. <u>See</u> <u>Bryant v. Rich</u>, 530 F.3d 1368, 1374 (11th Cir. 2008) (noting that a judge may conduct fact-finding when deciding "a motion to dismiss for failure to exhaust nonjudicial remedies").

The parties dispute whether Alabama's medical grievance system is "available" for a complaint about the HIV-segregation policy. At Alabama's four facilities that house HIV+ inmates, a prisoner must file an informal "Medical Grievance" form to the healthcare unit through the institutional mail system. A written response on the bottom of the same document is provided within five days. <u>See</u> Reese Affidavit (Doc. No. 35-1) ¶ 6; Hunt Affidavit (Doc. No. 35-2) ¶ 6. Below the response, the form states, in all caps:

34

"IF YOU WISH TO APPEAL THIS REVIEW YOU
MAY REQUEST A GRIEVANCE APPEAL FORM FROM
THE HEALTH SERVICES ADMINISTRATOR.
RETURN THE COMPLETED FORM TO THE
ATTENTION OF THE HEALTH SERVICE
ADMINISTRATOR.   YOU MAY PLACE THE FORM
IN THE SICK CALL REQUEST BOX OR GIVE IT
TO THE SEGREGATION SICK CALL NURSE ON
ROUNDS."

Reese Affidavit (Doc. No. 35-1) ¶ 6.  A written response
to a medical grievance appeal is provided within five
days.  In the interim, an inmate may be brought in for a
one-on-one conversation with the medical staff.  Id. ¶ 6.

The defendants contend that this medical grievance
system was not exhausted by the plaintiffs.
Specifically, ADOC points to the plaintiffs' claims of
disparate-healthcare treatment and the restrictive-
medical-clearance criteria for work release as issues
that should have been addressed through the prison's
medical grievance process.   The defendants provide
evidence--exhibits attached to affidavits--showing that
one plaintiff (Harley) used the medical grievance system

in the past, thus establishing that the plaintiffs were aware that it existed.  See id. Ex. B.

The plaintiffs respond that the medical grievance process is not "available" to them to challenge Alabama's HIV-segregation policy.  The plaintiffs contend that the Reese and Hunt affidavits focus exclusively on healthcare claims, not on the segregation policy more generally.  According to the plaintiffs, the defendants have not made any showing that the medical officers have any authority over the HIV-segregation policy.

The plaintiffs submit that ADOC "does not maintain any administrative remedy program system-wide, at Limestone, or at Tutwiler" for non-medical complaints.  Plaintiffs' Brief (Doc. No. 37) at 28.  The plaintiffs support this contention by inference from the medical grievance forms and through prisoner declarations that aver that no facility-specific, non-medical grievance system exists at Limestone and Tutwiler.  See Hatcher

36

Declaration (Doc. No. 37-5) ¶¶ 7-9 (Limestone); Harley

Declaration (Doc. No. 37-6) ¶¶ 5-9 (Tutwiler).

The plaintiffs also submitted a declaration by
Allison Neal, an ACLU attorney.  The Neal Declaration
states that ADOC's special counsel informed her during a
telephone conversation that "there is no formal system-
wide administrative remedy or grievance procedures."
Neal Declaration (Doc. No. 37-4) ¶ 2.  The Neal
Declaration also states that Limestone's warden told her
that there was no non-medical grievance system at that
institution.  Id. ¶ 3.

Under the PLRA, a grievance system needs to be
"available" in order to trigger the exhaustion
requirement.  See Turner, 541 F.3d at 1084 ("A remedy has
to be available before it must be exhausted.").  "Without
the possibility of some relief, the administrative
officers would presumably have no authority to act on the
subject of the complaint, leaving the inmate with nothing
to exhaust."  Booth v. Churner, 532 U.S. 731, 736 n.4

(2001).  The court finds that the medical grievance forms are "available" only to address medical issues and that no general, non-medical, system-wide grievance system exists in ADOC prisons.

At the top of the medical grievance forms, prisoners may check one of only two boxes: "Medical Grievance" or "Medical Grievance Appeal."  The <u>medical</u> grievance form, therefore, is no misnomer: the form deals solely with medical claims, not broader disputes about ADOC housing and transfer policy.

Moreover, the medical grievance forms include check-boxes for administrators to complete.  These boxes includes labels for healthcare issues (<u>e.g.</u>, "access to onsite care" and "medication issues") and a catch-all box labeled "other."  <u>See</u>, <u>e.g.</u>, Reese Affidavit (Doc. No. 35-1) at 11.  There is no indication on the form that it could be used to complain to prison officials--as opposed to the Correctional Medical Services personnel--about accommodations policy.

38

This reading of the medical grievance form comports with how prisoners interpreted it. <u>See</u>, <u>e.g.</u>, Harley Declaration (Doc. No. 37-6) ¶ 4-5. These declarations state that prisoners are told to submit only medically-related grievances to these systems. In fact, plaintiff Harley's medical grievance forms submitted by the defendants cut against their argument. Harley complains about medical issues, not ADOC's HIV segregation policy as it applies to accommodations. <u>See</u>, <u>e.g.</u>, Harley Grievance (Doc. No. 35-1) at 13.

And at oral argument, defense counsel listed examples of medical grievances: "[a]ny decision made by a member of the medical staff: when labs are drawn; what time of day they're drawn; whether a doctor evaluates...one of the named plaintiffs." Oral Argument Transcript (Doc. No. 56) at 34. These claims are not in the same class as a grievance against the HIV segregation policy.

39

Perhaps most revealing, the defendants have submitted no evidence that the medical professionals reviewing the medical grievance forms had any authority over non-medical issues or ADOC policy more generally.  Allowing ADOC to characterize the medical grievance process as a generalized system would bait-and-switch the plaintiffs.  See Goebert v. Lee County, 510 F.3d 1312, 1323 (11th Cir. 2007) (criticizing prison officials for playing "hide-and-seek" with administrative remedies); see also Hutto v. Barnes, No. 04-0522-WS-M, 2006 WL 2052596, at *1 n.1 (S.D. Ala. July 2006) (noting that ADOC failed to offer evidence of any state grievance procedure available to Alabama prisoners in support of its exhaustion defense).  In light of the evidence before the court, the medical grievance system is not "available" to the plaintiffs to address their grievances concerning the HIV-segregation policy.

The question, then, is whether ADOC maintains a general, non-medical grievance procedure. The court concludes that it does not.

The defendants have provided no evidence that an alternative, generalized system exists. The Neal Declaration confirms that, in this case, absence of evidence is evidence of absence. See Neal Declaration (Doc. No. 37-4) ¶ 2. The defendants have failed to meet their burden of establishing that a general grievance procedure exists. Because there is no non-medical grievance process, there is no exhaustion requirement before filing suit to challenge the HIV segregation policy. As the Eleventh Circuit has explained:

> "We find that the term 'available' in section 1997e(a) is used to acknowledge that not all prison actually have administrative remedy programs. Some state penal institutions may not have an administrative remedy program to address prison conditions, and thus there are no 'available' administrative remedies to exhaust. Section 1997e(a) permits these prisoners to pursue their claims directly in federal court."

<u>Alexander v. Hawk</u>, 159 F.3d 1321, 1326-27 (11th Cir. 1998).

The court notes that, with no generalized grievance system, ADOC inmates have lost "a way of attempting to improve prison conditions without having to file a lawsuit." <u>Turner</u>, 541 F.3d at 1084.  In turn, corrections officials "lose the substantial benefits that administrative remedies were intended to provide them." <u>Id</u>. at 1085.  ADOC officials have decided against maintaining a general grievance process to address inmate complaints about potentially unlawful activity in the prison system.  Accordingly, the plaintiffs may file suit directly in federal court to address these non-medical grievances.


2.  The "Need-Narrowness-Intrusiveness" Test

In prison litigation suits, a court granting prospective relief must determine "that such relief is narrowly drawn, extends no further than necessary to

correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

The defendants contend that the "relief requested does not meet the requisite standards for prospective relief under the PLRA." Defendants' Brief (Doc. No. 35) at 37.  According to the defendants, the plaintiffs have failed to satisfy this "need-narrowness-intrusiveness" test because a "prohibition on all discriminatory policies and practices for HIV inmates is entirely too broad and will ultimately hinder ADOC administrators." Id. at 38 (emphasis in original).

The "need-narrowness-intrusiveness" test, however, is a limitation on judicial authority over prisons at the remedial stage, not a heightened-pleading requirement imposed on the plaintiffs.  The PLRA's plain language makes this clear.  See 18 U.S.C. § 3626(a)(1)(A) ("The court shall not grant or approve any prospective relief unless the court finds" that it satisfies the need-

43

narrowness-intrusiveness test.) (emphasis added).  Other
provisions in § 3626(a) reinforce this reading, <u>see</u> <u>id</u>.
§ 3626(a)(3) (requirements for prisoner release orders);
<u>id</u>. § 3626(b) (placing conditions on the time period for
prospective relief); <u>see</u> <u>also</u> <u>Babbitt v. Sweet Home
Chapter of Comm. for a Great Oregon</u>, 515 U.S. 687, 702-03
(1995) (applying the Whole Act Rule), as does the
relevant precedent.  <u>See</u> <u>Williams v. Edwards</u>, 87 F.3d
126 (5th Cir. 1996); <u>Anderson v. Garner</u>, 22 F. Supp. 2d
1379 (N.D. Ga. 1997) (Murphy, J.).

The PLRA did not abrogate the longstanding rule that,
at the motion-to-dismiss stage, a complaint is judged by
whether it presents "enough facts to state a claim to
relief that is plausible on its face," <u>Twombly</u>, 550 U.S.
at 570, not whether the relief requested will be granted
in full.

D.  Sovereign Immunity

The defendants assert that sovereign immunity precludes this suit.  They note that the plaintiffs may not seek damages under Title II of the ADA because Congress failed to validly abrogate the States' sovereign immunity.  Seeking to avoid the Young fiction,  Ex parte Young, 209 U.S. 123 (1908), the defendants argue that Onishea and Edwards demonstrate that "not only is there ... no violation of federal law, but there is certainly not any ongoing and continuous violation."  Defendants' Brief (Doc. No. 35) at 41.   They contend that the plaintiffs failed to "allege an 'ongoing and continuous violation.'" Id.

But, as the plaintiffs point out, this is a suit for prospective relief, not for damages. Indeed, the relief sought is quintessentially prospective: a declaratory judgment and an injunction.  See Second Amended Complaint (Doc. No. 61) at 37.  The five defendants have been sued

**45**

in their official capacities, id. ¶¶ 11-15, thus triggering the Ex parte Young analysis.

In determining whether Young's exception to sovereign immunity applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Maryland, Inc. v. Public Service Comm. of Maryland, 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)) (alteration in original).  The court need not look to the merits of the suit to determine whether Young applies; an allegation in the complaint will suffice.  Here, the plaintiffs allege that the "Defendants are violating Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act."  Second Amended Complaint (Doc. No. 61) ¶ 113 (emphasis added).  Because the plaintiffs have alleged an ongoing violation of federal law and are

46

seeking only prospective relief, sovereign immunity presents no bar to this action.

The court notes that this case falls within a long history of suits brought by inmates seeking to vindicate their constitutional and statutory rights. <u>See</u>, <u>e.g.</u>, <u>Brown v. Plata</u>, 131 S. Ct. 1910 (2011) (affirming three-judge district court's order to reduce prison overcrowding); <u>Hutto v. Finney</u>, 437 U.S. 678 (1978) (affirming district court's 30-day time limit for placing prisoners in isolation cells); <u>Laube v. Campbell</u>, 333 F. Supp. 2d 1234 (M.D. Ala. 2004) (Thompson, J.) (approving settlement agreement to remedy Eighth Amendment violations at Julia Tutwiler Prison for Women). The Eleventh Amendment did not prevent courts from ordering prospective relief in these cases. Indeed, ADOC officials have recognized this fact in past litigation over this policy. <u>See</u> <u>Onishea</u>, 171 F.3d at 1296 n.11 (noting that defendants conceded sovereign immunity point during en banc oral argument).

47

\*   \*   \*

Accordingly, it is ORDERED that the defendants'
motion to dismiss (Doc. No. 34) is denied with the
understanding that the court will address the <u>res
judicata</u> issue after the bench trial.

DONE, this the 5th day of September, 2012.

<u>    /s/ Myron H. Thompson    </u>
UNITED STATES DISTRICT JUDGE