IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| LOUIS HENDERSON, DANA HARLEY, DWIGHT SMITH, ALBERT KNOX, JAMES DOUGLAS, ALQADEER HAMLET, and JEFFREY BEYER, on behalf of themselves and of those similarly situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:11cv224-MHT (WO) |
| KIM THOMAS, Commissioner, Alabama Department of Corrections; BILLY MITCHEM, Warden, Limestone Correctional Facility; FRANK ALBRIGHT, Warden, Julia Tutwiler Prison for Women; BETTINA CARTER, Warden, Decatur Work Release/ Community Work Center; EDWARD ELLINGTON, Warden, Montgomery Women's Facility, in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>OPINION</u>

The seven plaintiffs (Louis Henderson, Dana Harley,

Dwight Smith, Albert Knox, James Douglas, Alqadeer

Hamlet, and Jeffery Beyer) bring this lawsuit on behalf
of themselves and a class of all current and future HIV-
positive prisoners incarcerated in Alabama Department of
Corrections (ADOC) facilities.  They challenge the ADOC's
policy of categorically segregating HIV-positive
prisoners from the general prison population, arguing,
among other things, that, despite the dramatic advances
in the treatment of HIV and despite the plaintiffs'
differing individual circumstances, the plaintiffs are
being denied the opportunity to be even considered for
various rehabilitative services and programs offered to
other prisoners.  They have named as defendants ADOC
Commissioner Kim Thomas and the wardens of the four ADOC
facilities that house HIV-positive prisoners.

The plaintiffs claim that the HIV-segregation policy
discriminates against them on the basis of a disability
(HIV status) in violation of Title II of the Americans
with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.,
and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

2

Jurisdiction  is proper under 28 U.S.C. § 1331 (federal question).

Based on the evidence presented during a month-long non-jury trial and for the reasons that follow, this court holds that the ADOC has violated the ADA's Title II and the Rehabilitation Act's § 504.

## I. BACKGROUND

### A. HIV/AIDS

The human immunodeficiency virus, or HIV, is a chronic disease.  If left untreated, it weakens the immune system and eventually leads to death.  The disease unfolds in several stages.  Soon after contracting the virus, an infected person enters acute infection.  During this time, the person's viral load (the extent to which the virus is present in the blood) rockets upward. People in this stage of the disease can have hundreds of thousands of copies of the virus.  Despite that, people in this stage test negative for HIV.  This phase, known

3

as the "window period," generally lasts for a few weeks, but can extend as long as three months, and the people experiencing it represent the most infectious group of individuals with HIV.

Acute HIV gives way to chronic-HIV infection. During this stage, the viral load lowers. The final stage, advanced-HIV infection, occurs when the body's CD4 T-cells, which play a critical role in the immune system, drop to low levels and the viral load rises.[1] More commonly, this final stage is known as acquired immunodeficiency virus, or AIDS.

HIV emerged in the United States in the early 1980s and soon grew into an epidemic. HIV inevitably progressed to AIDS. Virtually everyone infected died. Meanwhile, no one, including the medical community, understood how HIV was transmitted. Fearing that even casual contact could spread it, doctors treating patients

---

1. As the facts will show, not everyone with HIV will enter this final stage.

with HIV wore protective gear so extensive it was nicknamed a "space suit."  The profound consequences of the disease, combined with lack of knowledge about how it could spread, created an era of hysteria in the epidemic's early days.

The tide began to turn in the decade that followed. In 1996, the first protease inhibitors were approved to treat HIV.  Highly active antiretroviral therapy (HAART), emerged as an effective weapon against the disease. These treatments did not eliminate the virus, but they did restrict its ability to progress and could stave off AIDS.  However, while important developments, early treatment combinations had many deficiencies.  The medications had to be administered multiple times each day; they had severe side effects, including diarrhea and peripheral neuropathy; and because the regimes were so complicated and so punished patients with side effects, many HIV patients failed to take their medication.

Today, advances in HIV treatment have profoundly changed the disease. There is still no cure for HIV: indeed, there is only one known case in which a person was completely cured of it. However, modern treatment regimes have rendered it manageable. The vast majority of HIV patients can be treated by one pill once a day; side effects are less severe, and, where they do occur, multiple treatment options allow patients to try different medications until they find one that works; and, most importantly, although people with HIV will require treatment for their entire lives, HIV is no longer invariably fatal. People who receive treatment for HIV can expect to enjoy near-normal lifespans.

HIV can be transmitted through contaminated blood and bodily secretions, commonly during unprotected sex (between a man and a woman or between men) and needle sharing (for drug use or tattooing, for example). It is not transmitted through casual contact or through the

food supply.[2]  A person would have to drink a 55-gallon drum of saliva in order for it to potentially result in a transmission.  There is no documented case of HIV being sexually transmitted between women.

Moreover, simply because HIV can be transmitted in certain contexts does not mean that it will be, or even that it is likely to be, transmitted by that means. Advances in antiretroviral treatment have not only ameliorated the effects of HIV, but have also powerfully reduced (and in some contexts, even vitiated) the possibility of transmission, even when individuals engage in high-risk behavior.  This is true because transmission typically occurs only when a person's viral load is at a certain minimum threshold.  Modern treatments, however, if successful (which they generally are), result in "viral suppression," a state in which the person's viral

---

2.    The U.S. Centers for Disease Control and Prevention excludes HIV from its list of diseases that can be transmitted through the food supply.

7

load is so low that the likelihood of HIV transmission is, generally speaking, virtually non-existent.

Because modern treatment is effective as prevention, the medical community now recommends that antiretroviral treatment be offered to everyone living with HIV who is ready and willing to take it.  This approach represents a sea change that has revolutionized the public-health strategy for preventing transmissions.

While in 2012, outcomes are better, treatment simpler, and prevention possible, social perceptions of HIV have yet to catch up with the modern realities of the illness.  Undoubtedly exacerbated by the terror that accompanied the disease in its early history, a relentless stigma adheres to HIV.  This stigma has at least two plausible sources.  First, HIV is most frequently found among historically marginalized populations: particularly, gay men.  Prejudice against homosexuals intensifies prejudice against HIV, and prejudice against HIV becomes a proxy for prejudice

against members of the gay community.  Because HIV is also more common among minorities and the poor, the stigma attached to HIV deeply implicates race and class prejudice, as well as homophobia.

A second source of stigma stems from the means of HIV transmission.  The plaintiffs' expert, Dr. Frederick Altice, an international authority on HIV and the Director of the HIV in Prisons Program at Yale University School of Medicine, explained: "People make judgments just by the virtue of HIV that you must have done ... something dirty or something awful to have acquired HIV. Being gay.  Being a prostitute.  Being sexually promiscuous."[3]  These impressions build upon negative stereotypes about the groups most commonly affected by HIV.

-------------------

3.  Unfortunately, the transcript from the trial is not yet available, and the court is therefore unable to cite to it.

The progression of how HIV has been handled in American prisons somewhat mirrors its progression in the free world: initial (and understandable) terror about its spread gave rise to drastic prevention measures, which subsided as both treatment and understanding of HIV improved.

The first report of HIV in prisons was made in 1983. Soon after, a critical minority (but never a majority) of state-correctional systems began segregating HIV-positive prisoners from the general prison population.  In the mid-1990s, as the fear surrounding HIV began to subside, most States that had enacted such policies reversed them. By 2006, only three States still segregated HIV-positive prisoners: South Carolina, Mississippi, and Alabama.  In 2010, Mississippi ended its segregation policy as well. Today, preeminent public-health organizations, including the U.S. Centers for Disease Control and the National Commission on Correctional Healthcare, uniformly recommend against segregating prisoners with HIV.

10

## B. The ADOC's HIV-Segregation Policy

As in the rest of the nation, the advent of the AIDS epidemic generated panic within the ADOC.  Billy Mitchem, the former warden of Limestone Correctional Facility, explained: "[E]verybody was ... afraid.  The inmates were afraid.  The staff was afraid.  We didn't understand, really, how you could get AIDS.  I mean, you used your imagination, and most of that was wrong....  And people were dying."

It was in this atmosphere that the ADOC established its original HIV-segregation policy.  The initial policy was austere.  HIV-positive prisoners were segregated in every aspect of their daily lives, from the dorms in which they were housed to the chapels in which they worshiped.  They had no access to the myriad programs available to the general-population prisoners.  At Limestone, the dorms where HIV-positive prisoners were housed were cordoned off from the rest of the prison by a fence with a locked-metal gate.  Plaintiff Dana Harley

described the circumstances of HIV-positive women in a
letter to the warden of Tutwiler:

> "We are in isolation from general
> population like we are contagious
> animals.  Officers only come and see
> about us when they see fit....
> Basketballs are flat and playing cards
> are beyond recognition.  It's enough to
> be living every day with our virus and
> trying to cope.  We are confined and
> can't even participate in everyday
> activities such as trade schools or
> state jobs to stay occupied....  It's
> like punishment three times over:
> Prison, the virus, then the denial of an
> education or trade.  We are secluded
> from everyday life."

Pls.' Ex. 82.

During this time, a class of HIV-positive prisoners
twice challenged the ADOC's segregation policy.  In the
first challenge, the plaintiffs alleged that the
segregation of recreational, religious, and educational
programs violated the Rehabilitation Act.  The district
court denied their claims, and, after a decade of
litigation, the Eleventh Circuit Court of Appeals upheld
that decision.  See Onishea v. Hopper, 171 F. 3d 1289

12

(11th Cir. 1999) (en banc).   Before the Onishea
litigation had concluded on appeal, the same class of
HIV-positive prisoners challenged the same policies, this
time under the ADA and the Eighth Amendment.  See Edwards
v. Ala. Dep't of Corr., 81 F. Supp. 2d 1242 (M.D. Ala.
2000) (Thompson, J.).   This court found that the
plaintiffs' claims in Edwards were identical to those
denied in Onishea and therefore barred under the doctrine
of res judicata.

In 2007 and 2008, the ADOC relaxed its segregation
policy.   HIV-positive prisoners were integrated into
trade schools, substance-abuse programs, and other
activities, and, for the first time, they were permitted
to participate in the work-release program.

At trial, the parties offered competing
characterizations of the department's policy as it
operates today.   The court finds that the policy itself
is best described as, in general, a series of
categorical, non-individualized determinations that the

13

department makes with regard to HIV-positive prisoners.
Simply put, in a number of aspects of institutional life,
HIV results in automatic placement and automatic
exclusion.  Outcomes that depend on a complex web of
factors for HIV-negative prisoners are determined based
on a prisoner's HIV-positive diagnosis alone.  Because
the policy differs with respect to male and female
prisoners, the respective practices are discussed
separately below.

## 1. Men

Every male prisoner entering the ADOC first reports
to Kilby Correctional Facility to undergo classification.
There, each prisoner is given a physical and mental-
health evaluation, is interviewed by a classification
specialist, and his behavioral history (particularly his
criminal history) is reviewed.  As a result of this
process, the prisoner is assigned a custody level.
Custody levels for men include "close," "medium,"

14

"minimum-in," and "minimum-out," and this designation determines the ADOC facilities to which the prisoner may be sent.[4] Different facilities provide varying levels of freedoms and restrictions. For instance, if a prisoner's classification number signifies that he is medium security, he may be placed at only a major facility that has armed guards. On the other hand, a prisoner who is designated as minimum-out can be placed at a community-work center.

The classification team also evaluates the prisoner's need for educational programs, trade school, substance-

---

4. Close custody is the most restrictive custody level. Prisoners who are classified at this level must be housed in a single cell, with movement outside of the housing area restrained, and the prisoner must be accompanied by armed correctional personnel. Medium custody prisoners may live in dormitories or double cells, must be assigned to a medium- or close-security institution, and must be supervised by armed correctional personnel when outside of the institution. Prisoners classified as minimum-in can participate in work assignments at ADOC facilities or off ADOC property with the supervision of correctional officers. Minimum-out prisoners can be assigned to off-property work details without the direct supervision of correctional staff.

abuse treatment, and certain mental-health programs.  As
Stephanie Atchison, Classification Assistant Director for
the ADOC, explained, this impacts the department's
placement decisions.  If, for example, a prisoner "needed
to participate in a substance abuse program," the
classification team would "approve a group of
institutions that offered substance abuse treatment, and
whichever one had the space available, that's the one he
would go to."  Finally, each prisoner is subject to a
medical and mental assessment, which can further limit
the number of facilities for which he is eligible.

For the approximately 250 men within the ADOC who are
HIV-positive, however, all of the factors normally
considered in the classification process are overridden
by an HIV-positive diagnosis.[5]  Upon entering the system,

_____

5.  Atchison explained that the automatic decision
with regard to HIV is a "placement directive."  Placement
directives come from the commissioner rather than from
the classification specialists and override normal
classification considerations.

every prisoner is given an enzyme-linked immunosorbent
assay (ELISA) test, which measures an antibody to HIV.[6]
If the test is preliminarily positive, the prisoner is
placed in an isolation cell to await confirmatory testing
with a Western blot test.[7]  If the Western blot test
confirms the diagnosis, the prisoner is transferred to
Limestone Correctional Facility.[8]  This occurs regardless
of whether the prisoner has complex medical needs or very
simple ones.   HIV is the only disease or medical

---

6.  The diagnostic test upon entry is required by
state law.  See 1975 Ala. Code § 22-11A-17(a).

7.  Testimony at trial demonstrated that, in addition
to the stress of being confined in an isolation cell,
this practice is harmful because it comes across as a
punishment for being diagnosed with HIV.  Plaintiff
Albert Knox explained: "I didn't feel like I deserved to
be locked up in [a segregation cell] ....   I always
considered seg to be a place where you [go when you]
screw up in prison or whatever ... that's a disciplinary
that you get ....  [F]or me to be locked up in there, and
I didn't do anything wrong, I didn't think it was right.
It was punishment."

8.  The testing process cannot reliably diagnose all
HIV-positive prisoners, however, because, as discussed
above, individuals who have recently been infected and
fall in the "window" period will not test positive for
HIV, despite being very contagious.

17

condition listed on the ADOC's medical-classification chart for which diagnosis alone, without any consideration of actual treatment needs, limits the prisoner's placement possibilities to a single facility. This placement is also made without regard to security-classification procedures.   Limestone is equipped to house only general-population prisoners who are medium and minimum custody; the only close-custody prisoners there are those who have HIV.

The decision to house men exclusively in Limestone results in a number of inevitable consequences.   For instance, prisoners who are not HIV-positive are assigned a mental-health code of zero through six; any prisoner with a mental-health code that requires special housing is sent to Bullock Correctional Facility (which can house codes three though six) or Donaldson Correctional Facility (which can house codes three and four). However, regardless of their mental-health needs, HIV-positive prisoners are precluded from Bullock and

Donaldson and instead placed at Limestone, which is only designed to house codes zero through two.

Program opportunities are also necessarily limited. For instance, the ADOC's sole 12-15 month therapeutic-community program for substance-abuse treatment is offered at St. Clair Correctional Facility. HIV-positive prisoners are never placed at St. Clair, no matter how dire their addictions. Further, while approximately 85 % of HIV infections in Alabama come from Mobile, Montgomery, and Birmingham, all of which are in central or southern Alabama, Limestone is located on the State's northern border, far from these cities (Mobile is an over five-hour drive from the prison). Therefore, while general-population prisoners are by no means guaranteed a placement near their homes and families, most HIV-positive prisoners are completely barred from this possibility. For many of them, this makes family visits difficult or impossible.

The segregation policy continues within Limestone. There, HIV-positive men are separated into two HIV-only dormitories: Dorms B and C.  Together, these dorms are known as the "Special Unit."  HIV-positive prisoners who are mentally ill, because they are barred from going to Bullock or another facility equipped to treat serious mental health needs, are housed in the Residential Treatment Unit, a set of nine cells in Dorm C cordoned off by a large metal cage, which juts out into the dorm's common area.  If an HIV-positive prisoner is placed in administrative or disciplinary isolation (for example, as punishment for his conduct), he is placed in the same isolation dormitory as the HIV-negative prisoners, Dorm E.  Although that dormitory includes only individual isolation cells that are locked closed throughout the day, which completely prevents any physical contact among prisoners, the HIV-positive prisoners are placed together in a row, separated from cells occupied by HIV-negative prisoners by a floating metal gate.

Because HIV-positive men are uniformly housed in Limestone's Special Unit, they are necessarily excluded from any benefits that stem from being housed in other dorms. Limestone has, for instance, a Senior Dorm, which provides a safer and calmer environment. There is also a Faith-Based Honor Dorm, whose prisoners enjoy occasional (though rare) benefits such as a family night, during which family members can visit and bring food. Limestone also offers a Pre-Release Dorm for prisoners who are within 120 days of their end-of-sentence dates. This dorm is designed to provide a supportive atmosphere for prisoners who will soon transition back into the free world.

HIV-positive prisoners are also barred from certain aspects of the Substance Abuse Program (SAP). In that program, which can last either eight weeks or six months, prisoners live together in a special dorm, take classes together, and eat their meals together. Dr. Altice explained at trial that this "milieu environment" is

often "extremely effective" because the "minute-by-minute interaction in the bathroom, in the dorms or in their housing units, [and] at meals" creates an "ongoing dialogue about the sort of issues that are taught" in the program.

HIV and substance abuse are frequently comorbid: currently, around 41 prisoners with HIV are enrolled in some component of SAP. However, while HIV-positive prisoners can participate in SAP classes, they are not permitted to live in the SAP dorm, and must return to the Special Unit for meals and when classes end each day. As a result, they are deprived of one of the fundamental qualities that makes SAP effective.[9]

---

9. At trial, the ADOC downplayed the importance of the residential aspect from which HIV-positive prisoners are excluded. However, this representation is belied by the department's own description of SAP's objectives: "The goals of the program are to: (1) offer a stable, quiet and <u>residential</u> environment wherein recovering inmates can <u>live together as a family</u>, reinforcing each others['] sobriety." Pls.' Ex. 51, at 15 (emphasis added). The very existence of a SAP dorm could be viewed as communicating the ADOC's belief that substance-abuse programming benefits from a residential component.

In addition to the housing-segregation policy, prisoners with HIV at Limestone are required to wear white armbands.  The ADOC attests that all prisoners are required to wear armbands of various colors and that each color simply designates the dorm to which each prisoner belongs.[10]  Commissioner Thomas explained that the armbands "help control the flow of inmates throughout a facility": they prevent violence and unauthorized activity because correctional staff can better monitor whether the prisoners are in their proper dorms. However, while no other two dorms share the same armband color, both of the Special Unit dormitories, Dorm B and Dorm C, are assigned white armbands.  A correctional officer stated that this makes it difficult to tell whether the HIV-positive prisoners are in their correct

---

10. There was conflicting testimony at trial about when the armbands policy was initiated.  Testimony from the plaintiffs' witnesses suggested that, originally, only HIV-positive prisoners had armbands and that other dorms were given armbands only after the onset of this litigation.   The ADOC disputes this chronology. Currently, every dorm except for the pre-release dorm uses armbands.

23

dorms, hollowing out the purported security purpose of the armbands.

There is one circumstance in which HIV-positive prisoners may be housed outside of Limestone: when they participate in the work-release program. Work-release placement allows selected prisoners to work (for pay) for participating employers in the community during the day, and then return to a work-release facility each night. While the ADOC operates a number of work-release facilities, HIV-positive prisoners are housed exclusively at one: Decatur Work Release. There, unlike at Limestone, HIV-positive prisoners are not required to sleep in a designated dorm, but instead share dormitories and the dining hall with prisoners who do not have HIV.

## 2. Women

Tutwiler is the only prison for women in the ADOC. Upon arrival there, each woman is given an ELISA test to determine whether she has HIV. If a woman's test comes back positive, an officer removes the woman from the receiving area and escorts her to an isolation cell. The woman then must wait there for several weeks (at times for up to a month) for the results of the Western blot to confirm the diagnosis.[11]

When diagnosis is confirmed, HIV-positive women are assigned to Dorm E, which is segregated from the general population. Like the men at Limestone, they are permitted to participate in the prison's various

---

11. This period of isolation, occurring just after the woman enters the prison and is newly diagnosed with HIV, is frequently traumatic. The women are provided with no educational materials or counseling. Plaintiff Dana Harley, an HIV-positive prisoner at Tutwiler, is frequently asked to counsel the women herself. "[U]sually they're going crazy," she explained. "Hysterical, crying ... like they're about to pass out, thinking they're going to die. I mean just going absolutely crazy."

programs.  However, also like the men at Limestone, they cannot reside in any specialized dorms, including Tutwiler's SAP dorm and Honor Dorm.  HIV-positive women who are mentally ill, instead of being placed in the open-bay area of the mental-health unit, are automatically sent to the isolation cells reserved for the seriously mentally ill (the Intensive Psychiatric Stabilization Unit), regardless of their actual mental-health needs.

### 3. Food-Service Jobs

Many prisoners at Limestone and Tutwiler have jobs in those prisons' kitchens.  In the work-release program, many of the approved employers are restaurants or food processing factories in the community.  HIV-positive prisoners, however, are wholly excluded from participation in any job related to food services: they may not hold kitchen jobs at Limestone and Tutwiler, and

they may not work for food-service employers in the work-
release program.

## 4. Work-Release Eligibility Criteria

When HIV-positive prisoners are considered for the
work-release program, they must meet a number of criteria
that are not imposed on other prisoners.  For an HIV-
positive prisoner (male or female) who is not taking HIV
medication, her viral load must be lower than 1,000 and
her CD4 count must be greater than 700 (or her CD4
percentage must be greater than 35).  An HIV-positive
prisoner who is taking HIV medications must be approved
for the keep-on-person program and have adhered to it for
six consecutive months or more.  Her viral load must have
been less than 48 for four consecutive readings, and her
CD4 count must be greater than 450 (or her CD4 percentage
must be greater than 30).  Each HIV-positive prisoner is
evaluated according to these criteria by an institution's

Site Medical Director or an HIV Specialist, who has the option to waive them at her discretion.

Although the ADOC manages populations with a number of illnesses that are equally as serious and as infectious as HIV, HIV is the only disease with a separate subset of criteria dedicated solely to it. It is also the only disease whose criteria are based on rigid numerical thresholds rather than treatment needs or functional abilities. A prisoner who does not have HIV is instead evaluated based on her medical code and the seriousness of her treatment needs. For instance, prisoners who are receiving dialysis, hepatitis chemotherapy treatments, and cancer treatments are not "clear" for work release (but the criteria do not categorically require people with these illnesses to satisfy any numerical criteria divorced from actual treatment or capabilities). Joint Ex. 35.

## II. DISCUSSION

### A. Justiciability

Before reaching the merits of the plaintiffs' claims, the court must decide whether they have standing under Article III of the Constitution to raise them.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (holding that standing, an "indispensable part of the plaintiff's case, ... must be supported ... at [each] stage[] of the litigation").  To satisfy Article III's standing requirements, a plaintiff must show (1) she has "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 180-81 (2000) (quotation marks and citation omitted).

As this case is a class action, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff [individually has standing to raise] that claim." <u>Prado-Steiman ex rel. Prado v. Bush</u>, 221 F.3d 1266, 1280 (11th Cir. 2000).  To analyze each claim separately, the court must first decide what claims have been raised.  That is, surprisingly, not simple here, because the plaintiffs have not framed the dispute in terms of discrete claims.[12] For reasons that will become clear below, the governing law in this case requires the court to decide certain issues separately in a manner that amounts to

_____

12. The plaintiffs assert a challenge both to the ADOC's HIV-segregation practice as a whole and to various aspects of the policy. They also presented significant evidence about the discriminatory effects of the policy, at times making it difficult for the court to discern what the plaintiffs considered to be true aspects of the policy and what were merely its deleterious effects. As previously explained, the court considers the heart of the challenged policy to be a series of automatic determinations made with regard to HIV-positive prisoners.  However, the challenged conduct is the determination itself, and not its many effects.

adjudication of several distinct claims for relief.  See
Harris v. Thigpen, 941 F.2d 1495, 1526 (11th Cir. 1991)
(requiring the district court to evaluate the risk of HIV
transmission occurring "with regard to each program from
which [HIV-positive prisoners] have been automatically
excluded," rather than with respect to prison in
general); see also Miller v. King, 449 F.3d 1149, 1150-51
(11th Cir. 2006) (stating that "it is important for lower
courts to determine on a claim-by-claim basis ... which
aspects of the State's alleged conduct violate[s] Title
II").   The court understands the plaintiffs' claims
against the HIV-segregation policies and practices at
ADOC prisons to encompass challenges to the following
discrete policies: (1) the policy that HIV-positive men
are segregated within Limestone from the general-
population prisoners; (2) the policy that HIV-positive
men are permitted housing only at Limestone and Decatur
Work Release, and excluded from all other ADOC men's
facilities; (3) the policy that HIV-positive women are

segregated within Tutwiler from the general-population prisoners; (4) the policy that women are allowed work-release housing at Montgomery Women's Facility, but not the ADOC's other work-release facility for women; (5) the exclusion of HIV-positive prisoners, male and female, from food-service jobs within the prison and at work release; (6) the eligibility criteria applied to HIV-positive prisoners, male and female, who apply to participate in the work-release program; and (7) the requirement that male HIV-positive prisoners wear white armbands.

As for the first two claims (segregation within Limestone and exclusion from other ADOC facilities for men), plaintiffs Louis Henderson, Jeffrey Beyer, and James Douglas have standing to challenge these policies. All three reside in the Special Unit at Limestone and wish to be integrated into the general population at Limestone and to be eligible for housing at other facilities. Plaintiffs Dwight Smith and Alqadeer Hamlet,

who are currently placed at Decatur Work Release, would like to be eligible for other work-release facilities; they therefore have standing to challenge the ADOC's policy of housing HIV-positive prisoners exclusively at Decatur.

As for the third and fourth claims (segregation within Tutwiler and eligibility for only one women's work-release facility), plaintiff Dana Harley has standing.  At the time this case began, Harley was housed in Tutwiler's segregation dormitory and wished to be integrated.  She also wanted to be eligible for all women's work-release facilities (rather than only for Montgomery Women's Facility).  All plaintiffs have standing to raise  the fifth (exclusion from food-service jobs) and sixth (HIV-related eligibility requirements for work release) claims, as all desire the opportunity to work in food-service jobs and to apply for work release without being subjected to eligibility criteria that they argue are discriminatory and unnecessary.  In particular,

plaintiff Douglas has been excluded from work release because of the eligibility requirements.  Lastly, all male plaintiffs have standing to raise the seventh claim, as they all are required to wear white armbands.

The ADOC devoted ample time at trial to the argument that class representatives who were denied certain benefits because of the policy lack standing because they would not have been guaranteed those benefits even if they were not HIV-positive.  For instance, the department argues that the male plaintiffs lack standing to challenge their ineligibility for transferring to facilities other than Limestone because no prisoner has a right to transfer to the facility of his choosing. Therefore, the ADOC argues, even if this court were to order relief, the plaintiffs' injuries could not be redressed.  However, this argument misses the point.  The plaintiffs are not challenging the outcome of the department's decisions, but rather, the fact that they are entirely barred from consideration because they have

HIV.  Therefore, the plaintiffs' standing hinges on the fact that they have not been considered even though they wish to be, not on whether this consideration would result in a particular outcome.  It has long been understood that governmental policies of exclusion and segregation create actual, concrete injuries that are redressable by the courts.  See, e.g., Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1537 (11th Cir. 1994) (holding that a claim of "exclusion ... and, as a result of this exclusion, imminent segregation," alleges a "redressable injury"); cf. Ne. Fla Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The 'injury in fact' in an equal protection

case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.")

The ADOC also contends that, because Harley was transferred out of Tutwiler and into Montgomery Women's Facility after the complaint in this case was filed, her challenge to segregation within Tutwiler is now moot. Further, towards the end of trial, the ADOC conceded certain aspects of the plaintiffs' claims and assured the court that its practices "would change" in certain respects.[13]  Now, the ADOC urges the court to disregard those claims, arguing that they have been mooted.

_____

13. The policies and practices that the ADOC committed to changing include: (1) the exclusion of HIV-positive prisoners from food-service jobs in prison and in the work-release program; (2) the requirement that all HIV-positive men wear white armbands; and (3) the policy that HIV-positive men are placed together in Dorm E (administrative and disciplinary isolation).  The ADOC also committed to evaluating options for removing the fence that currently surrounds the Special Unit at Limestone.

"[T]he voluntary cessation of challenged conduct will moot a claim only when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed." <u>Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 633 F.3d 1297, 1309 (11th Cir. 2011) (citations omitted). "Otherwise a party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." <u>Id</u>. (quotation marks and citations omitted).

The party asserting mootness generally bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur." <u>Friends of the Earth, Inc.</u>, 528 U.S. at 170. At the same time, however, a governmental defendant enjoys a "rebuttable presumption that the objectionable behavior will <u>not</u> recur." <u>Troiano v. Supervisor of Elections in Palm Beach Cnty.</u>, 382 F.3d 1276, 1283 (11th Cir. 2004) (emphasis in

37

original).  This court must conduct the mootness inquiry with attention to three relevant factors: (1) "whether the termination of the offending conduct was 'unambiguous'"; (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction"; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1310 (citations omitted).

The mootness issue with regard to Harley can be dispensed with easily.  The HIV segregation that Harley challenges at Tutwiler never ended: the ADOC simply removed her from the location of the challenged conduct. The only question, then, is whether Harley can expect to be subjected to the ADOC's practices at Tutwiler in the future.  Transfers between Tutwiler and Montgomery Women's Facility are common (indeed, Harley has previously been moved back and forth between the

facilities), and as such, there is a more than reasonable basis to believe that she will be subjected to segregation in Tutwiler again.

Nor is this court deprived of its power to decide the plaintiff's claims challenging policies that the ADOC now agrees to change.  The ADOC has provided no information about the department's deliberation process and has provided only vagueries about the basis for its decision to alter its policies.  Therefore, its policy changes are far from unambiguous.  See Harrell v. The Fla. Bar, 608 F.3d 1241, 1267 (11th Cir. 2010) ("[T]he Board acted in secrecy, meeting behind closed doors and ... failing to provide any basis for its decision [to change its challenged practices].  As a result, [the court has] no idea whether the Board's decision was well-reasoned and therefore likely to endure.") (quotations and citations omitted).  In addition, while "a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness ... cessation that occurs late in the

game will make a court more skeptical of the voluntary changes that have been made." Harrell, 608 F.3d at 1266 (quotation marks and citations omitted).  In this case, the department committed to policy changes at the close of trial, despite the fact that this litigation has been ongoing for over a year-and-a-half.  The concessions therefore seem more likely an attempt to avoid an unfavorable result in this litigation than "the result of substantial deliberation."  Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1310.

As to the third factor, the court has not received any concrete evidence as to whether and how any changes have, in fact, been made, nor has it received any evidentiary details about when and how future changes to the current policy might occur.  Therefore, the court cannot be sure whether the ADOC truly has mooted these claims.  All three factors thus counsel against a finding of mootness on the conceded issues.

In sum, all of the plaintiffs' claims present justiciable controversies. Neither the standing nor mootness doctrines preclude the court from reaching the merits of these claims.


## B. Title II of the Americans With Disabilities Act and § 504 of the Rehabilitation Act

The plaintiffs assert claims under Title II of the ADA and under § 504 of the Rehabilitation Act. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Section 504 provides that, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance." 29 U.S.C. § 794(a).[14]   Claims under both
statutes are governed by the same standards.  See, e.g.,
Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); see
also Everett v. Cobb County Sch. Dist., 138 F.3d 1407,
1409 (11th Cir. 1999).   To state a claim under either
statute, the plaintiffs must show:  "(1) that [they are]
qualified individual[s] with a disability; (2) that [they
were] either excluded from participation in or denied the
benefits of a public entity's services, programs, or
activities, or [were] otherwise discriminated against by
the public entity; and (3) that the exclusion, denial of
benefit, or discrimination was by reason of the
plaintiff[s'] disability."  Bircoll v. Miami-Dade Cnty.,
480 F.3d 1072, 1083 (11th Cir. 2007) (citation omitted);

---

14. Both statutes clearly apply to Alabama state
prisons. See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206
(1998)(holding that state prisons and jails are
considered public entities for the purposes of the ADA);
Pretrial Order (Doc. No. 177) at 12 (Stip. 1) (stating
that the ADOC receives federal financial assistance,
therefore subjecting the ADOC to the requirements of the
Rehabilitation Act).

42

see also Harris, 941 F.2d at 1522 (applying those elements in the prison context).   Because the same standards govern claims under both statutes, in the interest of brevity, the court will refer to both as "the ADA."

The plaintiffs correctly assert (and the ADOC concedes) that HIV is a disability under the ADA.[15] Therefore, the court's analysis addresses the other elements of a claim under the ADA.

_____

15.   The ADA and the Rehabilitation Act define disability as (among other things) "a physical or mental impairment that substantially limits one or more major life activities of such individual."   42 U.S.C. § 12102(1)(A) (ADA); 29 U.S.C. § 705(20)(B) (Rehabilitation Act).   The ADA Amendments Act of 2008 clarifies that "major life activities" includes "the operation of a major bodily function, including ... functions of the immune system."   42 U.S.C. § 12102(2)(B).   As HIV critically impacts the immune system, it is within the ambit of the statute.

## 1. Segregation

Among the regulations promulgated under Title II of the ADA is the "integration regulation," which provides that, "A public entity shall administer services, programs, and activities in the <u>most integrated setting appropriate</u> to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added). "[T]he most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. Pt. 35, App. B (2011).  Consonant with the integration mandate, the Supreme Court has concluded that, "Unjustified isolation ... is properly regarded as discrimination based on disability." <u>Olmstead v. L.C. ex rel Zimring</u>, 527 U.S. 581, 597 (1999).

At trial, the ADOC insisted that its policies do not amount to segregation.[16]   The department argued, in essence, that, because HIV-positive prisoners can participate in certain integrated programs, they are not truly "segregated."[17]   The ADOC enmeshed these arguments

_____

16. The ADOC made this argument despite the fact that, even during the trial, the department's own website described the policy as segregation.

17. The ADOC downplayed the significance of separate dorms for HIV-positive prisoners by referring to them as simply "where the prisoners sleep." See, e.g., Defs.' Pretrial Br. (Doc. No. 211) at 65 ("Class Representatives simply cannot sleep in the dorms ... with the rest of the general population); id. at 67 (referring to the plaintiffs' claim as a "sleeping arrangement request"). The ADOC's expert, Dr. George Lyrene, was particularly dismissive, stating that, "The argument about the importance of sleeping together seems petty and spurious to me." Defs.' Ex. 336, at 12.   However, the facts show that the dorm is more than where the prisoners sleep. Prisoners spend much of the day in their dorms. (Plaintiff Beyer reported spending an average of 7-8 waking hours in his dorm during the summer months, and 10 hours a day in the winter.   Plaintiff Knox testified that he spends around 6-8 hours each day in his dorm.) Residents of the Special Unit (and many other dorms at Limestone) also eat all of their meals there.   Beyer said of his dorm, "It's the place ... where I sleep, I eat, I read, I watch TV.   It's just the place where I live. ... [I]t's not just where I sleep."   Plaintiff Henderson
(continued...)

with an emphasis on the adequacy of medical care in the Special Unit and an account of various programs to which HIV-positive prisoners have access. Thus, the department's true meaning appears to be that, because the prisoners are not denied health care and because they have access to many programs, they have no right to complain about the fact that they are segregated. The court agrees that "segregation" is an uncomfortable term, loaded with implications of prejudice.[18] The court also finds that it is an appropriate way to describe the policy at issue here. Mandatory separate housing in a separate dorm (which is, for male prisoners, itself

_____

17. (...continued)
echoed Beyer's comments, saying of his dorm, "That's where I live."

18. "Segregation" is defined as "the separation or isolation of individuals or groups from a larger group or from society," but it can also refer to "the separation or isolation of a race, class, or ethnic group by enforced or voluntary residence in a restricted area, barriers to social intercourse, divided educational facilities, or other discriminatory means." Webster's Third New International Dictionary 2057 (2002).

46

within a separate facility) would doubtlessly violate the ADA if unjustified.    The same can be said for the practice of excluding HIV-positive prisoners from food-service jobs.[19]

However, the ADA extends its protections to only individuals claiming discrimination with respect to, or exclusion from, a public entity's services who were "otherwise qualified" for those services.   Onishea, 171 F.3d at 1300.  "'An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.'"   Id. (quoting Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979)).

The "otherwise qualified" analysis entails a two-part inquiry.   First, the court must determine whether the plaintiffs are qualified for integration where they are currently segregated.   Second, if the plaintiffs are not

_____

19. The ADOC's work-release policy and its policy requiring male prisoners with HIV to wear white armbands are analyzed under different legal frameworks under the umbrella of the ADA.

47

qualified as an initial matter, "the court must nevertheless evaluate ... whether reasonable accommodations would[, if made by the ADOC,] make [plaintiffs] otherwise qualified." Harris, 941 F.2d at 1525; see also Martinez v. Sch. Bd. of Hillsborough Cnty., 861 F.2d 1502, 1505 (11th Cir. 1988). The plaintiffs carry the burden of making a prima-facie showing that they are otherwise qualified or would be if the ADOC made reasonable accommodations. Onishea, 126 F.3d at 1329-30. If the plaintiffs make a prima-facie showing, the burden then shifts to the ADOC to establish that the proposed accommodations are not "reasonable" because implementation would impose "undue financial and administrative burdens" or require "a fundamental alteration in the nature of [the] program" at issue. Harris, 941 F.2d at 1572 n.48 (citations omitted); see also Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003) ("[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of

48

which, facially, do not clearly exceed its benefits, and ... [o]nce the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.") (quotation marks and citation omitted).

Courts have prescribed a particular analytical approach where the disability is a contagious illness. If a person with a contagious illness poses a direct threat to the health and safety of others, then she is not "qualified" within the meaning of the statute. See Onishea, 171 F.3d 1296-97. To make this determination, courts apply the factors identified by the Supreme Court in School Board of Nassau County, Florida v. Arline, 480 U.S. 273 (1987); see also Martinez, 861 F.2d at 1505 (explaining that, when a person is handicapped with a contagious illness, a court must first apply the Arline factors, and second, evaluate whether reasonable accommodations would make the person otherwise qualified); Onishea, 171 F.3d at 1297 (applying the

<u>Arline</u> factors to a challenge of the ADOC HIV-segregation policy).   The factors include: "(a) the nature of the risk (how the disease is transmitted), (b) the duration fo the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degress of harm." <u>Onishea</u>, 126 F.3d at 1297 (quoting <u>Arline</u>, 480 U.S. at 288).   In applying these factors, the court must take into account the basic principle that "the significance of a risk is a product of the odds that transmission will occur and the severity of the consequences."   <u>Id</u>.

<u>Arline</u> emphasized that these factors must be applied on an individualized basis: only by doing so can the court honor Congress's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks."

50

Arline, 480 U.S. at 287; see also id. (stating that "the district court will need to conduct an individualized inquiry" in applying the factors).  It follows that, in the context of a class action challenging the treatment of persons with a disability as a group, the court must not make a finding of significant risk as to the entire group unless it can be sure that no individual within the group would not pose such a risk.

When the Eleventh Circuit previously considered whether the ADOC's segregation policy violated the ADA, that court found that the seriousness of HIV, then a death sentence for everyone who contracted it, rendered unacceptable even a small (though plausible) risk of transmission.  See Onishea, 171 F.3d at 1293 ("HIV infection inevitably progressed to AIDS.  AIDS always led to death, often after lengthy suffering.").  The court held that, "when transmitting a disease inevitably entails death, the evidence supports a finding of 'significant risk' if it shows both (1) that a certain

event can occur and (2) that according to reliable medical opinion the event can transmit the disease." <u>Onishea</u>, 171 F.3d at 1299. Because HIV was inevitably fatal, those infected with it fell outside of the ADA's protections. Significantly, the Eleventh Circuit emphasized that its conclusion was based on "the state of medical knowledge and art at the time of trial." <u>Id</u>. at 1293.

Today, however, HIV does not invariably cause death.[20] The vast majority of infected individuals can expect to live a near-normal lifespan. Therefore, the heightened

_____

20. While the ADOC argues that the <u>Onishea</u> test still applies to HIV, they, puzzlingly, never argue that HIV is still <u>invariably</u> fatal; instead, they state that it is fatal <u>when left untreated</u>. Defs.' Prop. Findings (Doc. No. 246) at 6 ("<u>[I]f left untreated</u>, HIV has the same affect on people that it did before the development of the current antiretroviral medications, <u>i.e.</u>, development of 'full-blown' AIDS and inevitable death.") (emphasis added). It strains credulity to imagine that the Eleventh Circuit meant to encompass in its rule all diseases that are fatal without the benefit of modern medicine; indeed, albeit not contagious, conappendicitis, high blood pressure, and even tooth decay can be fatal when left untreated.

52

standard that the Eleventh Circuit applied in Onishea for fatal illnesses no longer applies to HIV.  Instead, this court must apply the "significant risk" test the the Supreme Court outlined in Arline.

The court may not simply conduct this analysis with respect to HIV in prison in general, however.  Instead, the court must consider the risk of transmission with respect to each specific aspect of institutional life in which the plaintiffs claim exclusion.  See Harris, 941 F.2d at 1526 (reversing the district court because it "should have determined the risk of transmission not merely with regard to prison in general, but with regard to each program from which appellants have been automatically excluded").  Because the plaintiffs have not provided clear guidance on how the court should parse their claims, the court will do so according to the different contexts in which the transmission risk may differ.  Assessment of the risk with regard to men must be separate from that with regard to women, since the

latter transmit the disease in more limited circumstances. Similarly, the risk differs in the context of food services from the risk posed by integrated dormitories. The court will therefore analyze each context in turn.

### a. The Special Unit Within Limestone

The court first addresses the ADOC's housing segregation policy at Limestone, which requires all HIV-positive prisoners to reside in the Special Unit.[21]   As

_____

21. The court notes the obvious fact that this is not a case in which the plaintiffs are unqualified because of legitimate eligibility requirements unrelated to their HIV status.  See, e.g., Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926, 928 (8th Cir. 1994) (addressing argument that student was excluded from interscholastic sports because of legitimate maximum-age-eligibility requirement, not because he had learning disabilities).  On the contrary, here, because housing is a necessary component of institutional life that is provided to all incarcerated persons, the plaintiffs clearly "meet all of [the] requirements" for being housed with the general population in ADOC facilities, Onishea, 171 F.3d at 1300; as such, the plaintiffs are unqualified for integrated housing only if they would "constitute a direct threat to the health or safety of other
(continued...)

this court has explained, HIV can be transmitted through contaminated blood or bodily fluids.   In the prison context, this is most likely to occur during unprotected sex or needle sharing (for example, intravenous drug use or tattooing).   See Onishea, 171 F.3d at 1294-95.

The degree to which a person with HIV is infectious can vary over the course of his disease.  As the court has already described, modern HIV treatments can not only effectively treat the virus, but, generally speaking, prevent its transmission.  Dr. Altice explained that "the newer HIV therapy regimens are so effective in suppressing the virus that HIV transmission is almost impossible even if high-risk activity occurs between HIV-positive and HIV-negative individuals, if the HIV-positive individual is receiving antiretroviral therapy and their virus is suppressed."  Altice Report, Pls.' Ex.

---

21.  (...continued)
individuals" and that threat could not be eliminated with reasonable accommodations.   Id. at 1296-97 (citations omitted); Harris, 941 F.2d at 1525.

107, at 6.  As the viral load drops, so does the risk of transmission, and, once full viral suppression is obtained, the risk is essentially non-existent.

The level of scientific certainly for this general principle, however, differs in different contexts.  The best data available come from randomized controlled trials.  In 2011, Science magazine reported the results of one such trial showing that, among heterosexual couples, the use of antiretroviral therapy dramatically reduces transmission of the disease.  Science deemed these results its "Breakthough of the Year."  The randomized control trial studying the effect of antiretroviral therapy on transmissions between men who have sex with men is still underway.  However, "community viral load data among men who have sex with men" suggest "a markedly reduced level of transmission" for that group as well.  It was clear to the court that both the plaintiffs and the ADOC had adopted the general principle that virally suppressed individuals are highly unlikely

to transmit HIV sexually, whether the sexual act is between people of different sexes or of the same sex. None of the ADOC's experts disputed the proposition that viral suppression dramatically reduces a person's ability to transmit HIV through sexual activity: The ADOC's expert witness, Dr. Steven Scheibel, stated that: "[S]omeone's not infectious in terms of sex if they have an undetectable viral load .... If ... people ... are on antiretroviral medication and the virus level is suppressed, they are ... very unlikely to transmit."

There has also been no completed randomized controlled trial studying the risk of transmission among virally suppressed individuals who share needles (although one such study is currently underway). Early indicators suggest that antiretroviral drugs have a similarly preventative effect when it comes to transmission through needle sharing. This outcome would be logical because, after all, regardless the means of transmission, so long as a person is adherent to

antiretrovirals, the virus will be only have a minimal presence in the blood and body fluids.  Based on the current state of medical knowledge, Dr. Altice found it probable that viral suppression reduces risk of transmission via needle sharing: "[C]ohort studies and community types of studies ... suggest[] that this treatment as prevention paradigm works for all groups. However, he conceded that "the jury's not in 100 percent" in that regard.  Dr. Scheibel was more skeptical: "[T]he bottom line is that we do not know how transmission may occur when people are sharing needles and when people are tattooing in terms of HIV transmission."  Despite Dr. Altice's optimism and indicators showing that virally-suppressed HIV-positive persons pose a drastically reduced risk of transmission when sharing needles, "'[l]aw lags science; it does not lead it.'"  McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1247 (11th Cir. 2005) (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir. 1996)).  Therefore, at this time, the court

cannot conclusively find that virally suppressed HIV-positive individuals who share needles pose no, or only a nominal, risk of transmission.

In addition to individuals who obtain viral suppression through medication, there is another very small group called "elite suppressors" who often have undetectable viral loads without the aid any HIV medications. The risk of elite suppressors spreading the virus is similar to that of persons who have obtained viral suppression throughout treatment. Dr. Scheibel's chart review of HIV-positive prisoners at Limestone reveals that the vast majority of prisoners on antiretroviral medications have acheived viral suppression. He also identified one elite suppressor among those who are not on HIV medication.

Based on this evidence, it is clear that at least some, if not a majority, of HIV-positive prisoners at Limestone present a very low risk of transmitting the

virus.[22]   Prisoners who have achieved viral suppression pose an infintesimal risk if they abstain from sharing needles, regardless of whether they have sexual intercourse with other prisoners.

The understanding that some people with HIV are very unlikely to transmit the disease is shared by ADOC Commissioner Thomas.   In the context of addressing the criteria the department uses to determine whether HIV-positive prisoners are eligible for work release, he explained that "the medical criteria allows ... a person [for] who[m] the risk of transmission is almost zero to have access to a work-release program."   Implicit in that testimony is that Commissioner Thomas not only believes that individuals exist within the system who are not

---

22. Despite the power of antiretrovirals to reduce the odds of transmission, adherence is key to the medications' success. People infected with HIV who are virally suppressed can quickly become infectious again if they cease to take their medicines.

infectious, but he also that believes that the ADOC is able to identify those individuals.[23]

The level of risk is somewhat different for prisoners who were not previously diagnosed with HIV (but had been unknowingly living with the disease) before entering the ADOC's custody.  This group is, generally speaking, very infectious until medication takes effect.  As the medication takes effect and the viral load lowers, the risk of transmission decreases accordingly.  Thus, for these prisoners, the probability of transmission will depend on the length of time over which they are adherent to medication and their behavior.  Should they engage in high-risk behavior (including both sex and needle-sharing) before achieving viral suppression, the risk of transmission is high.  On the other hand, if these

_____

23. Since HIV-positive prisoners are not segregated at work release, but are housed alongside HIV-negative prisoners, Commissioner Thomas's statement also relates confidence that the department can safely house at least some HIV-positive individuals with prisoners who are HIV-negative.

61

prisoners abstain from voluntarily participating in behavior that risks transmission, the risk is minimal. However, even in the absence of high-risk behavior, involuntary occurrences (such as rape) create some risk. Nevertheless, on balance, the probability of transmission posed by even a quite infectious person who does not voluntarily engage in high-risk behavior is generally low, and it will reduce drastically as treatment takes effect.

There may exist a small minority of prisoners who, for various reasons, will never achieve viral suppression (barring further advances in science or changes in behavior). For example, some people with HIV who have poorly adhered to antiretroviral medications develop strains of the virus that are resistant to treatment. Others may, for various reasons, be unwilling to take medications altogether. For these prisoners, the risk and probability of transmission are largely a function of

behavior (though this risk will be higher than that posed by prisoners who have achieved viral suppression), and the duration of the risk is indefinite. Essentially, the risk posed by this group is the same as that posed by all HIV-positive prisoners before the advent of antiretroviral treatment.

The ADOC's argument that integrating HIV-positive prisoners would increase the number of transmissions stems from the indisputable fact that integration would increase opportunities for high-risk behavior. However, the picture is more complex than the department suggests. HIV-positive and HIV-negative prisoners at Limestone already have ample opportunity to interact with one another and engage in high-risk activity in areas of the prison other than their housing units. As Dr. James Austin, a nationally renowned expert in prison and jail classification and risk assessment, explained, "sexual contact between prisoners occurs in virtually all areas

63

of prisons except where prisoners are in permanent isolation." Austin Report, Pls.' Ex. 108, at 15. Segregation also does not reduce opportunities for transmission through sexual activity between staff and prisoners, nor from prisoners who are transferred to county jails or work-release facilities (where they are not segregated) and then back to prison. Meanwhile, the transmission rate for HIV within the ADOC is exceedingly low: at or approaching zero.[24] In light of the substantial opportunities for interaction between HIV-positive and HIV-negative prisoners, the virtual nonexistence of transmissions within the ADOC casts serious doubt on the department's assumption that further integration would increase the transmission rate. It

_____

24. The low transmission rate is particularly notable because in the earlier litigation challenging the more stringent version of this policy, the ADOC argued, and the district court agreed, that "the transmission risk [was] significant in all programs." Onishea, 171 F.3d at 1295. In spite of this finding, no transmissions in fact occurred when programs were integrated.

instead appears that so long as integration is handled responsibly, it is unlikely to meaningfully increase transmissions, if at all.

Further still, it is possible that eliminating the segregation policy could deter high-risk behavior in some instances. Dr. Altice opined that, among HIV-negative prisoners prone to risky behavior, segregation could create a false sense of security. Believing that no one in their midst had HIV, they may be more willing to engage in high-risk behavior than they would otherwise. This could place them at risk for contracting HIV from highly infectious HIV-positive prisoners who were not segregated because they were tested during the "window period" (and for countless other sexually transmitted infections). Thus, perversely, it is at least, arguably, possible that the segregation policy could lead to

65

transmissions that would not occur if the prisoners were integrated.[25]

There is a small risk of transmission that exists under the current policy: this cannot be eliminated so long as human beings interact.  There is no evidence that integrating HIV-positive prisoners in housing would meaningfully increase the probability of transmissions. Although integration would certainly create more opportunities for high risk behavior, such opportunities exist now and have not resulted in any transmissions. The link between the department's lack of transmissions and the segregation policy thus merely amounts to post hoc ergo propter hoc.

─────────────────

25. Deputy Commissioner Emmitt Sparkman of the Mississippi Department of Corrections testified that he was not concerned about transmissions when that department integrated HIV-positive prisoners in 2010 because he felt the segregation policy simply created a false sense of security that encouraged high-risk behavior.

Regardess of the likelihood of transmissions, the significance of transmission for the person who becomes infected with the virus should not be understated.  There is no cure for HIV at this time.  Therefore, should a prisoner in the custody of the ADOC become HIV-positive while incarcerated, he will remain so for the rest of his life (barring scientific advances).  Accordingly, he would be burdened with a lifelong responsibility to maintain access and adhere to antiretroviral treatment, a failure to do so likely resulting in a dramatically shortened lifespan.  For the disproportionately poor prisoners in the ADOC, this responsibility (which is literally a matter of life or death) is no small thing. On the other hand, the consequences of being HIV-positive are not nearly as severe today as they were during an earlier time.  As has been discussed, the vast majority of people with HIV enjoy near-normal lifespans.  They can typically be treated with a simple one-pill-a-day regimen

67

free of crippling side-effects. And, because of
antiretrovirals, they can also engage in ordinary sexual
behavior without reasonable fear of transmitting HIV to
their partners. With appropriate treatment, they can
have lives nearly identical to those of people who do not
have HIV (that is, aside from having to take
medications).

Balancing these factors and weighing "the odds that
transmission will occur" against "the severity of the
consequences," Onishea, 126 F.3d at 1297, it is obvious
that, given the life-changing advances in HIV treatment,
ceasing the housing, categorically, of all HIV-positive
prisoners exclusively in Limestone's Special Unit would
not create "a direct threat to the health or safety of
other individuals" within the meaning of the ADA.
Onishea, 171 F.3d at 1296-97. A very low risk would be
created if the ADOC integrated HIV-positive prisoners on
an individual-by-individual basis, based, for example, on

whether their viral levels are suppressed and whether they have a demonstrated history of medication adherence and abstinence from high-risk behavior.  That description could fit many prisoners currently incarcerated in the Special Unit; segregating them thus violates the ADA.  On the other end of the spectrum, a threat could be created if the ADOC integrated (without imposing additional safeguards) HIV-positive prisoners with high viral loads who refuse to take medication and who have a history of risky behavior (for example, attempting to rape other prisoners).[26]

---

26. Integrating such persons could, in certain circumstances, amount to a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. See, e.g., Gates v. Collier, 501 F.2d 1291, 1300 (5th Cir. 1974) (finding an Eighth Amendment violation where inadequate medical care resulted in, among other things, "inmates with serious contagious diseases [being] allowed to mingle with the general prison population"); Clark v. James, 794 F.2d 595, 596 (11th Cir. 1986) (requiring "reconsideration of appellant's claim that by assigning him to prison duties requiring exposure to contagious diseases, prison officials violated his eighth ... amendment rights"); Billman v. Ind. Dept. of Corr., 56 (continued...)

What is critical here is that, despite this range of risk, the ADOC maintains a blanket policy of precluding all HIV-positive prisoners at Limestone from integrated housing, regardless of their individual circumstances. That policy denies plaintiffs the individualized determinations to which they are entitled under the ADA, see Arline, 480 U.S. at 287, and unjustifiably treats all HIV-positive prisoners identically, despite the fact that their circumstances are materially different, not identical. See Kapche v. City of San Antonio, 304 F.3d 493, 499 (5th Cir. 2002) (describing Supreme Court precedent interpreting the ADA as "consistently

_____

26. (...continued)
F.3d 785, 788 (7th Cir. 1995) (upholding Eighth Amendment claim alleging that "employees of the prison system, knowing that [a prisoner] had a history of raping his cellmates and was HIV-positive, nevertheless placed [the plaintiff] in the same cell without warning him of the danger he faced, and that they did nothing to interrupt the rape while it was in progress"). However, even with these prisoners, the court can discern no reason why the ADOC would need to treat them differently from other prisoners who have shown sexually predatory behavior and have serious infectious diseases other than HIV.

point[ing] to an individualized assessment mandated by
[the act]," and "further not[ing] that [the court is]
unaware of any decision from [its] sister Circuits
abrogating the requirement of an individualized
assessment in favor of a per se exclusion under the
ADA."). For this reason, the ADOC is currently violating
the rights of the HIV-positive prisoners within its
custody by categorically segregating them because of
their HIV status and excluding them from the integrated
housing for which they may be qualified.

The court witnessed the impact of the segregation
policy when it toured Limestone and the Special Unit with
both legal teams during the trial. The court recognizes
that the prisoners in the Special Unit were locked down
during the visit out of consideration for the court's
safety. Even discounting the effect of the lockdown,
the Special Unit evoked the feeling of a place abandoned.
The prisoners there displayed a striking uniformity of

disposition.  They peered, sullen, from their cells.  The quiet, which the ADOC touted at trial as an asset of the unit, seemed instead to accent the dormitories' isolation from the lively general-population dorms, communicating these prisoners' exclusion.  The imposing cage around the residential treatment unit, where mentally ill prisoners with HIV are kept, allows any observer to see the activity within.  The effect of a severely mentally ill man isolated within the cage, which juts into the common area where the prisoners eat and watch television, would surely be disturbing to those both within it and without. It is evident that, while the ADOC's categorical segregation policy has been an unnecessary tool for preventing the transmission of HIV, it has been an effective one for humiliating and isolating prisoners living with the disease.

As for the precise circumstances that would render a prisoner qualified or unqualified for integrated

housing at Limestone, the court need not draw such lines now, at the liability stage. This case is a class action including as plaintiffs all present and future HIV-positive prisoners within the custody of the ADOC. <u>See Henderson v. Thomas</u>, 2012 WL 3777146 (M.D. Ala. Aug. 30, 2012) (Thompson, J.) (certifying class). Consequently, for the ADOC to escape liability, there must be not a single HIV-positive prisoner who is or could be qualified for, and thus has the right to, integrated housing. That is clearly not the case. For now, it is sufficient to say that, pursuant to binding Supreme Court and Eleventh Circuit case law, the ADOC is in violation of the ADA with respect to the plaintiff class.

The only barrier to integrated housing for qualified prisoners at Limestone is the ADOC's medical classification system, which treats all HIV-positive prisoners identically and precludes them from being integrated. As such, the sole accommodation necessary

for qualified plaintiffs is that the ADOC modify its classification system to afford the plaintiffs the individualized determinations to which they are entitled instead of treating HIV status as a dispositive criterion regardless of viral load, history of high-risk behavior, physical and mental health, or any other individual aspects of the prisoner.

The facts (and common sense) compel the conclusion that making such a modification to the ADOC's policies is a reasonable accommodation that would not impose "undue financial and administrative burdens" or require "a fundamental alteration in the nature of" ADOC operations. Harris, 941 F.2d at 1527 n.48 (citations omitted). First, the ADOC has the ability to measure prisoners' viral loads; the ADOC already does so. Second, the department is capable of differentiating among prisoners on the basis of their behavior, since the ADOC already does this in the context of security classification.

Third, the department is likewise able to distinguish among HIV-positive prisoners based on their medical needs, as evidenced by the medical coding chart it already uses.  Fourth, there is no evidence that modifying its classification policies would require unreasonable cost expenditures.  See Onishea, 171 F.3d at 1303 (holding that cost is relevant for assessing whether an accommodation imposes an undue burden).  In short, requiring the ADOC to modify its classification system in order to effectuate integrated housing at Limestone would be reasonable.[27]

_____

27.  The ADOC asserts a fundamental-alteration defense to these accommodations.  If accommodations amount to a fundamental alteration, the defendants need not make them.  "[A] proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an 'essential' aspect of the relevant activity." Schwarz v. City of Treasure Island, 544 F.3d 1201, 1220 (11th Cir. 2008) (citations omitted).  For example, in PGA Tour, Inc. v. Martin, 532 U.S. 661, 682-83 (2001), the Supreme Court listed as examples of hypothetical fundamental alterations of a golf tournament, "changing the diameter of the hole from three to six inches," which would "alter an essential aspect of the game," or a change that "might
(continued...)

For those prisoners who are not currently qualified (perhaps because they are highly infectious), the law requires the ADOC to make reasonable accommodations that would render them qualified. See Bircoll, 480 F.3d at 1081-82 (citing 28 C.F.R. § 35.130(b)(7), which requires that "[a] public entity ... make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on

---

27. (...continued)
... give a disabled player ... an advantage over others," thus "fundamentally alter[ing] the character of the competition." Here, the ADOC contends that, because its current treatment of HIV-positive prisoners was shaped in part by prior litigation (in particular, the consent decree in, Leatherwood v. Campbell, No. CV-02-BE-2812-W (N.D. Ala. Apr. 24, 2004) (Bowdre, J.)), any change from the status quo would constitute a fundamental alteration. This contention is without merit. The fundamental-alteration defense is not intended to serve the purpose of foreclosing successive litigation on related (albeit not identical) issues. Moreover, despite what the ADOC may imply, the Leatherwood court did not order the ADOC to segregate HIV-positive prisoners from the general prison population; it merely addressed the unconstitutionally inadequate conditions of confinement that HIV-positive prisoners faced at Limestone at the time, namely, inadequate medical care. The court sees no tension between Leatherwood and its decision today.

the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

The plaintiffs have shown that reasonable accommodations exist that would reduce (and even eliminate) most of these individuals' odds of transmitting the disease. Principally, Dr. Altice explained that, "From a public health and clinical perspective, the rational way to reduce the risk of HIV transmission in prison is not through housing segregation but through effective HIV treatment." Altice Report, Pls.' Ex., at 6. Under this approach, antiretroviral medication is offered to every HIV-positive person who is ready and willing to take it so that it will suppress the virus and reduce or eliminate the chances of transmission. Taking this step could eliminate many prisoners' likelihood of transmitting HIV. Thorough

education would also play a preventative role.   These methods are reasonable ways to reduce the risk of transmission.

The court emphasizes that, in affording HIV-positive prisoners the individualized determinations to which they are entitled, the ADA grants the ADOC discretion in choosing how best to do so.  See, e.g., Frame v. City of Arlington, 657 F.3d 215, 246 (5th Cir. 2011) ("Indeed, a municipality is granted the discretion to choose how best to make its services accessible."), cert. denied, 132 S. Ct. 1561 (2012).  This court is "sensitive to ... the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of" prisoners.  Brown v. Plata, 131 S. Ct. 1910, 1928 (2011); see also Turner v. Safley, 482 U.S. 78, 85 (1987) ("[F]ederal courts have ... reason to accord deference to the appropriate prison authorities.").   In making determinations as to

particular prisoners' qualifications for integration, the ADOC is entitled to rely on the reasonable judgments of its medical professionals.  See Olmstead, 527 U.S. at 602 ("Consistent with [the ADA's prohibition of unnecessary segregation], the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program."); Arline, 480 U.S. at 288 ("[C]ourts normally should defer to the reasonable medical judgments of public health officials.").

However, while the law grants the ADOC deference in choosing how to satisfy its responsibilities, the department is of course obligated to act in good faith as it works to ensure that no prisoner in its custody remains unnecessarily segregated because of his HIV status.  Cf. Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011) ("[W]hen an employer's

unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates [Title I of] the ADA.") (citation omitted).

A final aspect of the ADOC's housing policy at Limestone warrants brief discussion: the practices in Dorm E. That dormitory houses both HIV-positive and HIV-negative prisoners who have been placed in administrative or disciplinary isolation. As was noted above, before the end of trial, the ADOC conceded this aspect of the plaintiffs' challenge and assured the court that its practices would change. Now, the ADOC urges the court to disregard the issue, arguing that it has been mooted. The court, however, finds good cause for resolving the matter. For the reasons given earlier, the court has not been deprived of its power to determine the legality of this challenged conduct simply because the ADOC says it has voluntarily ceased that conduct during the course of

litigation. <u>See</u> <u>Nat'l Ass'n of Bds. of Pharmacy</u>, 633 F.3d at 1309. Moreover, the ADOC's conceded practices have evidentiary relevance; they speak to the credibility of the department with regard to other justifications, and they provide evidence of the department's intentional discrimination against individuals with HIV.

Unlike prisoners housed in other parts of Limestone, prisoners in Dorm E are restricted to their closed (and locked) cells (each of which holds only a single prisoner) for almost the entire day. They leave their cells only when handcuffed and escorted by ADOC staff. Because of this intensive monitoring, they have no physical contact with one another at any time, and consequently, transmission of HIV between an HIV-positive and HIV-negative prisoner in isolation is not remotely possible. Nevertheless, the HIV-positive and HIV-negative prisoners in Dorm E are segregated: HIV-positive prisoners are clustered together separately from the HIV-

negative prisoners.  Because the size of each group will differ depending on isolation needs at the time, the dorm features a "floating gate" that the ADOC uses to demarcate the border where the HIV-positive cluster ends and the cells housing HIV-negative prisoners begin.

Because ending segregation in Dorm E would present absolutely no risk of harm, it is clear that the ADOC's policy of separating HIV-positive prisoners and HIV-negative prisoners in the dormitory and using the physical infrastructure of the building to indicate which prisoners have HIV, is, and has always been, wholly unnecessary and promotes no legitimate purpose.  As such, it serves only to discriminate for the sake of discrimination.  That is precisely the sort of "irrational disability discrimination" that the ADA "seeks to [prohibit]." <u>Tennessee v. Lane</u>, 541 U.S. 509, 522 (2004); <u>see also</u> <u>Bledsoe v. Palm Beach Cnty. Soil and Water Conservation Dist.</u>, 133 F.3d 816 821-22 (1998)

(holding that the ADA prohibits "all discrimination by a public entity" regardless of the form it takes).

The ADOC's practices in Dorm E are most relevant in that they illuminate the intent underlying the department's treatment of HIV-positive prisoners. In order to accommodate assumed and actual anti-HIV prejudice among its staff and prisoners in its custody, and to some extent due to prejudice that stems from department decision-makers, the ADOC has sought to segregate HIV-positive prisoners from the general population in all possible contexts regardless of whether any legitimate purpose is served by doing so. Moreover, the ADOC has been uninterested in reexamining seemingly irrational policies. Only at the eleventh hour, during the last days of trial, after the ADOC was at a loss for words in mustering a justification for its practices in Dorm E, did the department seek to assure the court that these practices would change. See Defs.' Resp. to

83

Judicial Request (Doc. No. 240) at 1-2 (responding to a judicial inquiry about the purpose of the Dorm E practices by referencing unspecified prior "conflicting statements," but not attempting to put forth any actual purported purpose).

In addition to Dorm E, certain other unnecessary features remain in place at Limestone. One standard operating procedure, which remains on the books (though purportedly unenforced), warns that, "Routine physical contact with Special Unit inmates should be kept at a minimum at all times." Joint Ex. 7, at 3. "Any staff member who enters the cell of a Special Unit inmate may wear ... 1) plastic or latex gloves; 2) Face mask; 3) Goggles; 4) Protective Rainwear." Id. A barbed-wire fence surrounds the two Special Unit dorms. Originally, that fence separated HIV-positive prisoners from general-population prisoners in the common yard. The gate to the fence is kept open now, but the fence is no less

visible; it remains a stark reminder of the HIV-positive prisoners' separation.[28]  These relics of the department's earlier policies, unaltered despite having no current purpose, suggest that other aspects of the policy are likewise relics of a different era, retained by the department due more to inertia than because they are truly needed today.

Moreover, these other unnecessary features matter in their own right, even if unused.  They impress upon both the prisoners and ADOC staff that HIV-positive prisoners are different and dangerous.  Despite the ADOC's

_____

28. The fence's purpose (enforcing segregation) is obvious in the layout of the prison.  Much of Limestone's grounds are symmetrical.  After entering the prison's front entrance, to the left is the "A-Side" of the facility, and to the right is the "B-Side."  Each side is made up of five separate dormitories (all of which are identical) that are laid out in a circle with a common yard in the middle.  Two of A-Side's dormitories, Dorms B and C, make up the Special Unit.  A-Side and B-Side are completely identical in their physical appearance, except that for the large, barbed-wire fence that cuts through the middle of the common yard and around the two Special Unit dormitories.  Of course, no such fence exists on B-Side (which is otherwise identical in all respects).

modifications to its policy in recent years, the symbolic power of the segregation policy has not been diluted. Like the fence with its unlocked gate, the barrier between the prisoners with HIV and the rest of the prison is more visible and more imposing than the narrow doorways that allow them access.

### b. Exclusively Housing HIV-positive Men at Limestone and Decatur Work Release

The ADOC has neither argued nor given the court any reason to believe that the transmission risk posed by housing HIV-positive prisoners in general-population dorms at Limestone would differ in any meaningful way from housing HIV-postive prisoners in general-population dorms at other facilities throughout the State.  Nor has the ADOC argued or presented evidence that housing HIV-positive prisoners at a work-release facility other than Decatur would pose any additional risk of transmission. Therefore, the court may answer the "otherwise qualified"

question with the same analysis under <u>Arline</u> articulated with respect to housing within Limestone.  In terms of the <u>Arline</u> analysis, to the extent that HIV-positive prisoners are qualified for integrated housing within Limestone, they are, to the same extent, qualified for integrated housing at any other facility.  Similarly, the same accommodations that the court has already found reasonable (modifying the ADOC's classification system and various prevention measures) would suffice to consider HIV-positive men for prisons other than Limestone.  Since HIV-positive prisoners are already housed in an integrated setting at Decatur Work Release, the court finds that no concerns about transmission justify a blanket bar on housing HIV-positive prisoners at other work-release facilities.

The question, instead, is whether housing prisoners at facilities other than Limestone and Decatur would impose an undue burden on the State.  In essence, the

ADOC argues that its current system of providing HIV care at Limestone is effective, and that housing HIV-positive prisoners at other facilities would inevitably denigrate the quality of care.  Likewise, the department explains that HIV-positive prisoners in the work-release program are housed exclusively at Decatur because it is close to Limestone, which allows prisoners at Decatur ready access to Limestone's medical facilities.  The ADOC states that housing prisoners at other facilities would force it to alter its current system of providing medical care to prisoners who have HIV.  This, they attest, would drastically diminish quality of care for HIV-positive prisoners and would be cost the State more money than it has to spend.[29]

---

29. As context for its argument, at trial the ADOC emphasized the significant advances in HIV care that the department made pursuant to its settlement with a class of male HIV-positive prisoners incarcerated at Limestone in Leatherwood v. Campbell, No. CV02-BE-2812-W (N.D. Ala. Nov. 18, 2002) (Bowdre, J.).  In that case, the plaintiffs challenged the inadequate medical treatment and
(continued...)

The court first considers what accommodations would be necessary in order to house HIV-positive prisoners at other facilities.  In doing so, the court will not assume that the ADOC would have to house prisoners with the most dire medical needs at every facility in the State.  Instead, the court will simply evaluate what would be required to end the ADOC's current policy of categorically housing __all__ HIV-positive prisoners in one prison and one work-release facility.[30]

---

29. (...continued)
substandard housing provided to HIV-positive prisoners. In the 2004 settlement, the ADOC agreed to significant changes to its housing and standard of medical care for prisoners with HIV.  In 2006, the consent decree expired. However, the ADOC has continued to adhere to its terms. Experts on both sides agree that the current level of care is good, and the ADOC has shown that it may well exceed the level of care typically provided in the community.

30. The ADOC argues that the plaintiffs can find no relief here because the ADOC's prisoners, regardless of any diseases they may have, do not have a right to be transferred to the facility of their choice and, therefore, this court cannot "allow[] HIV-positive inmates greater access or rights to the benefits of
(continued...)

The court first observes that care for HIV-positive individuals can be highly variable, ranging from profoundly complex care to a regime that is relatively simple.  In assessing the ADOC's claims, the question is not whether <u>every</u> facility or even whether <u>any</u> additional facility could provide adequate care for the most ill prisoners, but rather whether <u>any</u> facility could provide HIV care for <u>any</u> of the system's HIV-positive prisoners.

One critical component of the ADOC's current system of care is the availability of an HIV specialist to meet with prisoners at Limestone.  The parties dispute how often and to what extent a specialist must be involved in

_____

30. (...continued)
services and programs afforded to all inmates." Defs.'
Pretrial Br. (Doc. No. 211) at 31.  The ADOC misconstrues
the plaintiffs' claim.  The plaintiffs do not request a
right to transfer to the facility of their choosing; the
plaintiffs ask only not to be segregated on account of
their HIV status.  <u>Cf</u>. <u>United States v. Jefferson Cnty.</u>
<u>Bd. of Educ.</u>, 380 F.2d 385, 390 (5th Cir. 1967) (school
children have the right to desegregated education despite
the fact that "a schoolchild has no inalienable right to
choose his school").

care.  Dr. Altice opined that, while it is appropriate
for HIV patients initially to be monitored quarterly by
a specialist, patients who become stabilized and virally
suppressed do not require such frequent consultation with
a specialist: instead, they can be monitored by a
specialist as little as twice a year.  Dr. Altice found
that, for a stable patient, a specialist may also
evaluate laboratory results without even seeing the
patient.  The ADOC's experts contested Dr. Altice's view.
Dr. Lyrene noted that some very sick patients must see a
specialist every day.  Dr. Schiebel stated that, while
biannual appointments with a specialist may be
appropriate for a stabilized and adherent patient, a more
conservative approach is appropriate in the prison
environment, where adherence to medication is a
challenge.  Dr. Scheibel also emphasized the value of a
specialist's opinion in evaluating lab results,
addressing drug interaction concerns, and treating
comorbitities.

It is clear that every person infected with HIV will require access to a specialist at certain points. However, the degree to which this is required varies both from patient to patient and from one time to another as a patient's disease progresses. No expert has testified that every person with HIV requires daily or even weekly treatment from a specialist. Moreover, no expert disputed that, for at least some patients, quarterly or even biannual meetings with a specialist are adequate to manage their HIV (although Dr. Scheibel expressed skepticism as to whether any prisoner within the ADOC falls into this category). Dr. Lyrene testified that the HIV-positive prisoners at Limestone are generally healthy. Dr. Scheibel found, through a chart review, that most have acheived viral suppression. Therefore, the court concludes that, for at least some of the HIV-positive prisoners, daily or weekly access to an HIV specialist is not necessary for their care.

The court also finds that, to the extent that specialty care is needed, reasonable accommodations are

available that could make HIV specialty care available at
multiple facilities.  One means of doing so, much debated
at trial, is telemedicine, whereby an HIV specialist
would virtually consult with primary care providers in
other locations.[31]  The ADOC's primary argument against
telemedicine is based on cost.  To that end, the
department presented Hal White, the director of an
information technology consultancy.  White conducted a
thorough  evaluation  of  the  costs  of  implementing

---

31.  The court finds it clear the telemedicine is an
adequate means of providing access to specialty care.
However, the debate over its merits at trial warrants
some discussion.  Dr. Altice testified that telemedicine
has been effectively used for the provision of HIV
specialty care in a number of other prison systems.  Dr.
Scheibel suggested that telemedicine is less than ideal
because the primary care physician may lack experience
with HIV and may not report back to the specialist.
However, he also reported that most patients he had
consulted via telemedicine had good outcomes, although
several experienced nonadherence problems, which he
attributed to unknowledgable primary care physicians.
Dr. Lyrene expressed concern about practical matters,
such as the handling of patient files.  The court finds
that these concerns can be addressed through simple
planning and training, particularly since telemedicine
has been effectively implemented elsewhere.  Further,
while the ADOC's experts identified concerns about
telemedicine, neither suggested that it is an inadequate
means of providing HIV care.

telemedicine within the ADOC and visited various facilities to assess potential challenges. He estimated that the total cost of installing the necessary technological equipment for all ADOC prison sites for five years would be $ 2,026,619.53. While the ADOC emphasized this larger number at trial, the cost for each individual facility was estimated at $ 21,184 for equipment with an additional $ 8,217.53 to install special equipment at Limestone, from which it is presumed the HIV-specialist would operate. The facilities would then have highly variable maintenance costs, ranging from a total of $ 8,000 per facility over a five-year period to $ 49,250 per facility. The General Fund Appropriation for the ADOC for fiscal year 2012 is $ 377,900,000; the total cost of adding telemedicine at one facility for five years at even the most expensive facilities therefore amounts to .02 % of the ADOC's budget. At the least expensive facilities (of which there are 13, according to White's expert report), the cost would amount to less than .01 % of the budget. Given this,

while the court stops short of deciding whether telemedicine is the best or even a good option for the ADOC, the court concludes that it would not be prohibitively costly to install telemedicine in at least one additional facility (and, indeed, the plaintiffs do not insist that it should be installed at every facility in the system).

Even if telemedicine were not possible, however, the plaintiffs also make the plausible suggestion that an HIV specialist could travel to different locations within the system to see patients. Further, the plaintiffs presented evidence that in certain other states, HIV-positive prisoners travel to a designated prison for HIV specialty care. The court finds both of these options particularly feasible since stable HIV patients require care only quarterly or biannually. In sum, the court is not convinced that the ADOC could not find a reasonable, cost-effective way to provide HIV specialty care on an as-needed basis in at least one facility other than Limestone.

**95**

The ADOC similarly argues that the other members of its medical staff, from doctors to pharmacists, cannot provide adequate HIV care at any facility other than Limestone.  The department contends that it cannot train staff at other facilities to provide adequate HIV care. Further still, the ADOC claims that its staff cannot adequately provide the routine monitoring necessary to track the progress of HIV.

However, even if the court takes the ADOC's experts at their word when they say that the department's medical staff is not currently equipped to handle even basic care for HIV-positive prisoners, the court does not find it credible that the ADOC cannot sufficiently train at least some medical staff enough that they could provide the most basic HIV care.  The plaintiffs have shown that an abundance of resources exist in Alabama from organizations that specialize in the provision of HIV care and are ready and willing to train ADOC staff for free.  For instance, Dr. James Raper, who directs the 1917 Clinic, a multispecialty HIV practice at the

University of Alabama at Birmingham with vast experience
in the provision of HIV care (including to patients
exiting the correctional system) testified that he would
be open to having health care providers at his clinic
assist with the delivery of health care to HIV-positive
prisoners on a consulting basis.  Madeleine LaMarre, a
nurse practitioner who served as nursing director and
clinical services manager for the Georgia Department of
Corrections and participated in a committee to oversee
that department's transition from a segregated to
integrated system for HIV-positive prisoners, evaluated
the resources available in Alabama for HIV treatment and
concluded that these resources were adequate to train
ADOC staff at multiple facilities.  Given LaMarre's
experience overseeing Georgia's transition from a
segregated to integrated system and her personal outreach
to HIV care professionals in Alabama, the court finds
that her testimony merits substantial weight.

   Dr. Altice also presented evidence that effective
training has been possible in several state systems, many

of which he consulted during that process.  In Florida,
for instance, he helped create a mini-residency program
to train correctional medical staff throughout the state
in routine primary HIV care.  On-site training helped to
"create[] de-facto treating experts where there had
previously been a complete void."  Moreover, this was all
achieved at a time when, unlike today, HIV care was
"really, really complex" across the board.

It is readily apparent that, if the ADOC wishes to
train medical staff at other facilities (at least enough
to equip them to address the basic needs of stabilized,
virally suppressed HIV-positive prisoners), it may do so.
Further, it may do so at minimal or no cost.

The ADOC's protestations do not alter the court's
opinion.  They do, however, expose a persistent pattern
in the ADOC of maintaining the status quo on the basis of
mere assumptions rather than actual investigation.  For
instance, Assistant Commissioner of Health Services Ruth
Naglich admitted that she was unfamiliar with any of the
options that the plaintiffs offered for the provision of

free training for medical staff in HIV care.  Further
still, in making a determination that delivering HIV care
at facilities other than Limestone would raise costs, she
did not consult with a single community health-care
organization in Alabama.  This would have been fruitless,
she assumed, because "community providers ... generally
do not wish to come into the confines of the prison.  So
therefore, we would have to take our inmates out into the
community to receive care."  Based on the testimony of
the plaintiffs' witnesses, her assumption was incorrect.

Dr. Scheibel testified that, even if training was
provided, the individuals trained would still not rise to
the level of expertise.  This may well be.  However, this
argument does nothing to disrupt the court's conclusion
that medical staff could learn the basic HIV care needed
for at least some HIV-positive prisoners within the
system.

The ADOC further argues that, if prisoners were
housed outside of Limestone, it could compromise their
adherence to HIV medications.  The court takes very

seriously the ADOC's concerns about adherence.  It is evident that adherence to medications is both highly important and a persistent problem in the provision of HIV care.  However, the court does not find that the ADOC has provided any meaningful link between its segregation policy and adherence.  Dr. Scheibel's testimony showed that it would be possible for a prisoner to feel embarassed by his medications or its side effects, particularly diarrhea, when housed in general population, and that this could result in nonadherence.  However, this argument is counter-weighed by Dr. Altice's equally convincing opinion that segregation can cause depression and deprives prisoners of the mental-health and substance-abuse services offered at other facilities, which can lead to nonadherence.  Moreover, while several of the ADOC's experts speculated that segregation could create a community that encourages adherence, Dr. Altice emphatically and credibly attested that no medical literature supports the premise that <u>involuntary</u> immersion in a community of people with HIV has any

positive effect on adherence (or any therapeutic benefits whatsoever). Indeed, the plaintiffs in this case uniformly expressed only deep sadness at being segregated, and the ADOC presented no prisoner witnesses to contradict this testimony. Therefore, while the court finds that adherence is of tantamount concern for HIV patients, the court does not find that housing prisoners in a segregated environment makes adherence more likely. To the extent that the ADOC argues that adherence issues are better addressed by professionals who are knowledgable about HIV, the court finds that, given the resources available, this concern can be addressed through training. In any event, and perhaps most importantly, the ADOC has also not shown why it could not identify prisoners with an adherence problem and address those prisoners' behavior separately from adherent patients; indeed, Dr. Scheibel was able to identify such individuals in his chart review. In sum, adherence should be addressed on an individual-by-individual basis, as the ADA requires, rather than categorically.

The ADOC's arguments about medical care are also undermined by the wide variety of correctional systems that have successfully provided care in more than one facility. It is evident that there is no one-size-fits-all approach. Each system approaches this issue differently based on its needs. Dr. Altice provided several examples of systems in which he served as a consultant. In California, for example, the largest prison system in the country, facilities throughout the State can manage HIV, but the State also maintains a central unit where patients with complex medical needs can go on a purely voluntary basis. In Texas, routine HIV care is provided at prisons throughout the State, often supplemented by specialty care provided via telemedicine. Texas also maintains specialty centers for more intensive treatment. Florida maintains six to eight "centers of excellence" to manage complex HIV, but does not require HIV-positive prisoners to remain at these centers if their conditions are stable. In Massachusetts, HIV patients are monitored on-site

throughout the entire system, and specialty services are provided as needed from the central office. LaMarre testified to the success of the integration program in Georgia, which relies on its medical prison for complex HIV care but does not require HIV-positive prisoners to be housed there when stable. While Alabama is different from each of these States, each of these States is equally different from every other. Therefore, while this court does not go so far as to prescribe which of these systems might suit Alabama,[32] the court does not find it credible that Alabama is uniquely unable to provide HIV at even one additional facility.

---

32. Dr. Altice also stopped short of prescribing which system would work best for Alabama. This task is impossible, he said, without serious discussion among the key stakeholders. He described the process used in other States, which he testified that Alabama should pursue: "[Y]ou get the ... health professional leaders. You also get the correctional ... staff involved. You draw up a map ... and you put in a lot more information in terms of which places have got medical facilities. Sometimes the places will make some decisions about augmenting some of their staffing, or they may move staffing around. But it's a process. It's not something that you can just go in in five minutes and say, 'here's the fix.'"

The ADOC's current mechanisms for assessing the needs of prisoners with other serious diseases casts further doubt on its contention that it cannot change its current system. The department's own medical coding guide provides a powerful example. While the ADOC does medically cluster inviduals with certain conditions, in the case of other chronic diseases, it does so by assessing the actual medical needs of the prisoner, not diagnosis alone. For instance, a chronic-care clinic patient, such as a person suffering from hepatitis C, who has been diagnosed for at least three months, is stable, and requires provider follow-up no less than every 120 days, can be placed at any institution within the system. However, a person with hepatitis C who requires chemotherapy may only be housed at four institutions: St. Clair, Tutwiler, Donaldson, and Limestone. Even adopting Dr. Scheibel's more conservative estimate that a stable, virally suppressed person with HIV must see a specialist every three months, under the medical coding guide as it is applied to all other prisoners, that person would be

eligible for any institution in the ADOC.  However, instead of providing any sort of scale for HIV-positive prisoners with different needs, the guide instead limits them to Limestone and Tutwiler alone.[33]

Testimony at trial revealed that other diseases routinely managed by the department are as, or more, challenging to manage than HIV.[34]  The ADOC's ability to place them based on their actual medical needs and provide them with adequate care deeply discredits its arguments that it cannot do the same for HIV.  The only plausible differences that the ADOC's experts identified between HIV and these diseases are that medication

---

33. The guide also indicates that HIV-positive prisoners may be housed at Kilby, which is the classification prison for men.  HIV-positive prisoners are housed in isolation cells during the classification process at Kilby before being transferred to Limestone.

34. For example, Hepatitis B, a viral infection that is transmitted in the same way as HIV, is two to two-and-a-half times more prevalent in prisons nationwide than HIV and is 20 times more infectious than HIV.  Hepatitis C is 10 to 15 times more prevalent in prisons nationwide and is 30 % more infectious than HIV.  Since 2007, the mortality rate for Hepatitis C has exceeded that for HIV.

adherence is more important for HIV patients and that HIV has no cure.   The former distinction can be easily dismissed: good adherence can, and should be addressed on an individual-by-individual basis.   The second distinction is irrelevant to the feasibility of providing care.

The plaintiffs have also presented evidence that the ADOC's HIV-segregation policy may actually undermine the level of care provided to HIV-positive prisoners in certain respects.   First, the policy of automatically sending HIV-positive prisoners to Limestone necessarily bars those prisoners from other facilities, some of which provide care that is not available at Limestone.   A key example is Bullock, where prisoners with complex mental-health problems are treated.   Dr. Altice testified that, "[O]ftentimes, HIV is the least of [a prisoner's] worries.... [F]or individuals who don't have access to the kind of full array of treatment that is going to be most optimal and important to them, it can actually detract from HIV treatment outcomes."   Further, because

106

HIV-positive prisoners are barred from the residential aspect of the substance-abuse treatment program within Limestone and cannot participate in the much more robust therapeutic-community program at St. Clair, they are denied the best treatment for their substance-abuse needs.  This is significant because HIV is commonly comorbid with substance abuse.  Dr. Altice found in a study that HIV patients whose substance-abuse needs are met are five times more likely to adhere to their HIV medications.

In sum, the ADOC has failed to show that it is necessary to categorically house all HIV-positive males only at Limestone (and Decatur Work Release) in order to provide adequate care.  Indeed, it is possible that the policy actually worsens treatment outcomes, particularly for patients with other severe needs that cannot be adequately addressed at Limestone.

In reaching these conclusions, the court does not speculate as to how many institutions could feasibly provide HIV care or how many HIV-positive prisoners could

107

be removed from Limestone and housed elsewhere.  Instead, the court simply concludes that the ADOC's current assumption, that no HIV-positive prisoner could receive adequate care at any other institution within the system, lacks credence.  The ADOC's own expert, Dr. Scheibel, perhaps expressed the court's impression best: "HIV is a complex disease, and we have to ... examine it <u>patient by patient</u>." (emphasis added.)  When determining the medical needs of people with HIV, "[y]ou can't group all patients together."

In addition to its contentions that the required accommodations would impose an undue burden, the ADOC contends that housing HIV-positive prisoners at additional facilities would constitute a fundamental alteration of its system for providing medical care.  A fundamental alteration exists where a proposed accommodation would "elimininate an 'essential' aspect of the relevant activity." <u>Schwarz</u>, 544 F.3d at 1220.  The basic purpose of a prison medical system is to provide care to its prisoners. <u>See</u> <u>id</u>. at 1221 (considering the

"basic purpose" of zoning in order to determine whether a proposed change amounted to a fundamental alteration). Thus, while a fundamental alteration may exist if the plaintiffs requested that the ADOC fire all of its doctors or eliminate its pharmacies, the accommodations necessary to house HIV-positive prisoners at additional facilities do not amount to such a drastic change, particularly because this step may be taken without compromising the quality of medical care given to prisoners (and, indeed, it must not be compromised). See Henderson, 2012 WL 3777146, at *6 ("Notwithstanding any relief that may be ordered in this case and the expiration of the Leatherwood consent decree, the defendants are still obliged to provide HIV+ inmates a constitutionally adequate level of care. The Eighth Amendment and federal anti-discrimination statutes are not mutually exclusive.").

In evaluating a State's fundamental-alteration defense, a district court must also be attentive to the cost of the proposed changes to the system in light of

both the resources at the State's disposal and the State's other responsibilities.  See Olmstead, 527 U.S. at 597.  The ADOC vigorously argued that enacting any of the changes proposed by the plaintiffs would be prohibitively costly.  It emphasized the dire state of the department's finances: Steve Brown, the Associate Commissioner for Administrative Services in the ADOC, testified that the department is facing a $ 15 million budget shortfall and is operating on a severely constrained budget.

The court does not doubt that the ADOC suffers from severe shortages of funding.  However, the court is not convinced that dismantling its segregation policy would add any significant costs to the department's budget.  The ADOC has presented evidence that an increase in transmissions within the prison would cost the department a substantial amount of money because it would then have to treat the infected prisoners' HIV.  However, the court is not convinced that the transmission rate would rise upon integration.

The department also argued that the cost of providing medical care at facilities other than Limestone would be cripplingly high.  The evidence showed, however, that medical-training resources are available to the ADOC at low cost or cost-free.  Moreover, the options for specialty care, which could range from telemedicine to the specialist traveling to select facilities to prisoners traveling to meet the specialist, present a number of cost-effective options from which the ADOC may choose.

The ADOC might even save costs by dismantling its segregation policy.  Indeed, Emmitt Sparkman, Deputy Commissioner of the Mississippi Department of Corrections, testified that ending the HIV-segregation policy actually saved his department money on the whole. He explained: "[W]henever you have a specialized population it's more costly, because they can only be housed in one location."  This limits the department's flexibility in placing and moving prisoners.  As an example, Sparkman explained that, if a prison maintains

111

a housing unit with 50 beds in the HIV unit, but only 20 HIV-positive prisoners, the prison still must staff that unit for 50 beds, which wastes resources. Sparkman's analysis can be easily applied to the ADOC. For instance, while Limestone is not designed to house close custody prisoners, it must do so within the Special Unit because all HIV-positive prisoners are assigned there.[35] Therefore, the court finds it likely that the expenses that the ADOC incurs in changing its policy will be at least somewhat offset by the money it saves by having a more flexible system. In sum, then, the court does not find that ending the HIV-segregation policy would be prohibitively costly for the ADOC. Therefore, the department's cost-based fundamental alteration defense must fail.

---

35. Special measures (and, by basic inference, additional resources) are required for prisoners in close custody: they must be housed in a single cell, and, when outside of the housing area, restrained and accompanied by armed correctional personnel.

112

The court concludes that the ADOC's current policy of categorically housing HIV-positive prisoners within Limestone and Decatur Work Release violates the ADA.  The court need not decide now how far the ADOC must go to act within the confines of the law, and this holding should not be interpreted to mean that integrating HIV-positive prisoners at every facility in the state is necessary nor that integrating them at only one additional facility is enough. It sufficient at this stage to find that the current categorical policy violates the law.


c. The HIV-Segregation Policy for Women at Tutwiler and
     Montgomery Women's Facility

The court now turns to the female plaintiffs' claims. The female plaintiffs challenge the ADOC's policy of requiring all HIV-positive women to be housed in Dorm E at Tutwiler, which precludes them from integrated housing in the general-population dormitories, and also from housing alongside HIV-negative prisoners in the infirmary and mental-health unit.  They also challenge the fact

that they are eligible to be housed only at Montgomery Women's Facility when they participate in the work-release program.   The court will first address the segregation policy at Tutwiler.

While it is clear that some men at Limestone could be provided integrated housing without posing a meaningful risk, it is even more obvious that this is true for the women at Tutwiler.  The vast majority of women (four out of five) within the ADOC who are taking antiretroviral medication have acheived viral suppression, which dramatically reduces the probability of transmission.[36] In addition, the transmission risk among women is significantly lower than it is among men because women cannot transmit the virus through sexual activity.  As the court has already stated, there has never been a

_____

36.  The one patient who had not yet achieved it had recently begun the medication, and so there had not been enough time for her virus to become undetectable.

114

documented case of HIV that was sexually transmitted from one woman to another.[37]

Further, as is the case with male prisoners, the opportunities for high-risk behavior that already exist have not yielded any transmissions.  Women are integrated in programs at Tutwiler and thus have the opportunity to engage in high-risk behavior in places other than their dorms.  Sexual conduct with staff (including staff-on-prisoner sexual assault) and travel between county jails and work-release centers present further opportunities for high-risk behavior.  Nevertheless, the transmission rate among female prisoners within the ADOC is at or approaching zero.  Moreover, there is no evidence that the transmission rate is any higher in other prison systems where female prisoners with HIV are integrated.

---

37. The department argued that transmission is possible when women use sexual devices ("toys") and presented thin evidence that such devices have been used at Tutwiler.  However, even accepting this fact as true, it is obvious that the chances of transmission through sexual activity between women are significantly lower than the chances of transmission through sexual activity between men.

The evidence also casts doubt on the ADOC's
characterization of its policy as a practical necessity
divorced from any discriminatory intent.  The court
gained the impression that animus against HIV-positive
prisoners has emanated from the top at Tutwiler,
particularly from its warden, Frank Albright.  Dana
Harley described Warden Albright's reaction when, in
preparation for a legal challenge, she and the other
women in Dorm E began filing requests for access to
various programs from which they were excluded because of
their HIV-positive status.[38]  A week after they filed the
requests, Warden Albright "[s]tormed in" with a captain,
a lieutenant, and the entire classification team, and
said: "[T]he next request you write, write it to me so I
can deny it personally.  Because when you file the
lawsuit, I want it to say 'Albright' with one 'L.' ...
Y'all will not walk my halls and spread HIV."  At trial,
Warden Albright demonstrated willful ignorance about HIV:

--------

38. This incident occurred in 2007 before Tutwiler
had integrated its programs.

he testified that he did not know, and did not need to know, whether HIV can be transmitted through food preparation.   Harley also reported that correctional officers at Tutwiler commonly refer to Dorm E as the "AIDS dorm."[39]   From the attitude exhibited by Albright and his staff, it is plainly apparent that prejudice, at least, infects the way that the HIV-segregation policy is implemented.

The court's impression of the atmosphere at Tutwiler is powerfully informed by the court's tour of the prison during the trial.   During the tour, part of Dorm E was under construction, but this did not influence the court. Only four HIV-positive women are currently housed in Tutwiler, and, when the court visited, only three were

_____

39. Disclosure of HIV-positive status is an inevitable byproduct of segregation at Tutwiler just as it is as Limestone.   The HIV-positive women at Tutwiler do not wear white armbands; however, because they are housed together in the small facility, it is abundantly clear who they are.   Dana Harley echoed male prisoners' feelings about forced disclosure: "It doesn't bother me for people to know my status if I choose to disclose it," she said, but she did not want "to be labeled in the HIV dorm."

present in Dorm E.   The court struggles to convey the
depression in that room, so thick it felt possible to
reach out and touch it.   While the other dorms in
Tutwiler were vibrant, Dorm E was nearly empty.   Vacant
bunk beds lined the room, stripped of sheets and
mattresses.   It resembled an isolation cell more than it
did a dorm.

Balancing the relevant factors and weighing "the odds
that transmission will occur" against "the severity of
the consequences," Onishea, 171 F.3d at 1297, it is
obvious that HIV-positive female prisoners in the custody
of the ADOC are not categorically unqualified for
integrated housing.   Requiring the ADOC to modify its
procedures to make individualized determinations is at
least as reasonable for female prisoners as it is for
men.   Given that there are usually hundreds of HIV-
positive male prisoners and under ten HIV-positive female
prisoners in the ADOC's custody at any given time, the
burden imposed on the ADOC in making individualized
determinations for female prisoners is far lighter.

Further, the department's cost-based defense is even weaker in the context of Tutwiler than it is for men. Indeed, it is almost certain that the department is in fact wasting valuable resources by maintaining the segregation policy: Dorm E at Tutwiler--a large space filled with empty beds--is being used to house only a few women. Therefore, requiring the ADOC to dismantle its policy of segregating HIV-positive women would neither impose "undue financial and administrative burdens" nor require "a fundamental alteration in the nature of" ADOC operations. <u>Harris</u>, 941 F.2d at 1572 n.48 (citations omitted).

The court now turns to the ADOC's practice of housing HIV-positive women exclusively at Montgomery Women's Facility. The ADOC justifies this policy on the same basis that it justifies housing HIV-positive men exclusively at Decatur: Montgomery Women's Facility is close to Tutwiler, allowing women in the work-release

program access to the medical services at the prison.[40] For the same reasons that this court concluded that the ADOC can provide (at a minimum) basic HIV care for men in at least one additional facility, the court finds that the department can do so in this context as well.  This is particularly feasible since the ADOC operates only one work-release facility for women other than Montgomery Women's Facility.  Thus, for the same reasons expressed above, ceasing to place women categorically at Montgomery will not impose an undue burden on the State or cause it to fundamentally alter its system of providing medical care.

---

40. HIV-positive women already reside in integrated housing at Montgomery Women's Facility, and the ADOC has not suggested that there are any differences in the transmission risks at its other work-release facility for women.  Therefore, the court easily concludes that no concerns about transmission justify this policy.

### d. Food-Service Jobs

The court now turns to two policies that impact both male and female prisoners: the exclusion of HIV-positive prisoners from kitchen jobs within Limestone and Tutwiler and from holding food-service jobs in the work-release program. The ADOC committed to changing these policies at the end of trial and no longer attempts to defend them. Although the ADOC argues that the issues are moot, the court, for reasons already given, disagrees. <u>See Nat'l Ass'n of Bds. of Pharmacy</u>, 633 F.3d at 1309.

The challenged policies are obviously irrational. As both parties agreed, the science is unanimous: there is no risk of HIV spreading through food. Therefore, there is no plausible argument (and the ADOC did not attempt to make one) that barring HIV-positive prisoners from food-service jobs within the prisons and at work release prevents the transmission of HIV. However, before the ADOC conceded these issues at the end of trial, it first attempted to put forth other justifications. For one, the ADOC argued that, if it allowed HIV-positive

121

prisoners to take food-service jobs on work release,
employers may withdraw from the program because of their
own anti-HIV prejudices.   The ADOC wisely no longer
contends that accommodating assumed prejudice is a
legitimate justification for discriminating against the
plaintiffs in this way.[41]

Moreover, despite the ADOC's insistence that concern
about transmission risk played no role in the food-
service policy, the evidence suggests that many ADOC
staff members are unaware that HIV cannot be transmitted
through food preparation and that staff members acted on
their misconceptions.   Plaintiff Knox testified that,
after he ate with the general-population prisoners that
were in SAP with him, prison officials disciplined him

_____

41. The ADOC also argued that a primary motivation
for excluding HIV-positive prisoners from food-service
jobs within prisons is the threat that HIV-negative
prisoners would react with violence.  The ADOC used this
justification for several of its policies and presented
evidence about this risk generally, rather than how this
risk would manifest with regard to specific policy
changes.  The court addresses this argument later in this
opinion.

for creating a health hazard and searched for the utensils and plates that he had used to eat his meal (presumably fearing that they were contaminated). Further, as the court has already noted, the warden of Tutwiler did not know that HIV could not be transmitted through food. Therefore, despite the ADOC's protestations that its food-service policy is not based on transmission risk, it is evident that false beliefs about this risk, at the very least, have impacted the way that this policy is implemented.

At this stage, the ADOC puts forth no further justifications for this policy, and the court will not search for one. Because the challenged policies irrationally exclude the plaintiffs from programs to which they are unquestionably qualified, those policies violate the plaintiffs' rights under the ADA.

But, most importantly, the ADOC's adherence to its food-service policy throughout most of this litigation, (including the trial), its relucance to reexamine its policy, and its seemingly deliberate indifference to the

unfounded prejudice that the policy reinforced, buttress this court's earlier conclusions that the ADOC's arguments in support of its overall segregation policy are based in large measure on a failure to reexamine that policy in more detail in light of what other States have done and in light of the resources that are available in this State.

## 2. Work Release

In addition to the integration mandate, the ADA prohibits the unnecessary exclusion of disabled individuals. The implementing regulations to the ADA state:

> "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be <u>necessary</u> for the provision of the service, program, or activity being offered."

124

28  C.F.R.  §  35.130(b)(8)  (emphasis  added).
"[L]egitimate safety requirements" may be imposed, but
only when they are "necessary for safe operation" and
"based  on  actual  risks  and  not  mere  speculation,
stereotypes, or generalizations about individuals with
disabilities."  28 C.F.R. § 36.301(b).

The plaintiffs argue that the work-release criteria
that  the  ADOC  imposes  on  HIV-positive  prisoners
constitute unnecessary eligibility criteria and therefore
violate the ADA.   It is evident that the eligibility
criteria at issue tend to screen out individuals with
HIV.  Indeed,  screening out at least some individuals
with  the  virus  is  precisely  what  the  criteria  were
designed to do.  Of course, because the ADA's protections
extend to only qualified individuals with disabilities,
the plaintiffs must also show that at least some of the
class  members  on  whom  the  criteria  were  imposed  are
otherwise qualified for work release.  This, however, is
easily satisfied: the work-release criteria are imposed
upon (and therefore burden and diminish the chances of

participation for) all HIV-positive prisoners who are considered for work release.  This includes those prisoners who ultimately satisfy the work-release criteria and are admitted into the work-release program and therefore obviously are qualified for participation.[42] However, under the current criteria, even these individuals have a lower chance of being admitted and are subjected to standards that prisoners who do not have HIV are not.

The ADOC therefore bears the heavy burden of showing that the criteria are necessary.  See <u>Guckenberger v.</u>

---

42. The plaintiffs also provide specific examples of how the criteria have in fact screened out individuals who are qualified.  For instance, James Douglas was denied medical clearance because of a "blip" that showed a viral load measurement over the required threshold, even though viral load returned to undetectable levels after the blip.  The ADOC argues that Douglas was denied participation in work release because of his history of escapes; however, this does nothing to change the fact that eligibility criteria were imposed on him with regard to his viral load despite the fact that they were unnecessary.  Moreover, plaintiffs who have not achieved viral suppression but have consistently abstained from any high-risk behavior may be qualified for work release; the criteria categorically disallow any such individuals to participate.

<u>Boston University</u>, 974 F. Supp. 106, 139 (D. Mass. 1997) (Saris, J.) ("[The defendant's] burden is a heavy one because it must show that the more stringent eligiblity criterion is 'necessary' to achieve [the defendant's] goal.").

At trial, however, the ADOC sought to justify these criteria under an incorrect standard. By the department's account, the standard for evaluating the work-release criteria is the one the Supreme Court identified in <u>Turner v. Safely</u>, 482 U.S. 78 (1987), in which the Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." <u>Id</u>. at 89. The ADOC argues that the <u>Turner</u> doctrine applies to statutory rights (including those afforded by the ADA) as well as constitutional rights, and cites <u>Onishea</u> for support. Thus, under <u>Turner</u>, the ADOC argues, the work-release criteria must merely satisfy a "reasonableness" test. Defs.' Br. (Doc. No. 247) at 7.

But Onishea rendered no such holding.  Indeed, the court explained that Turner "does not, by its terms, apply to statutory rights."  Onishea, 171 F.3d at 1300; see also Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996) (referencing the Turner doctrine as balancing judicial restraint against "the need to protect constitutional rights") (emphasis added); Al-Amin v. Smith, 511 F.3d 1317, 1327 (11th Cir. 2008) ("Turner ... adopted a ... test for determining whether prison practices impermissibly burden inmates' constitutional rights") (emphasis added).[43]

Because the ADOC has applied the wrong standard, it has neither argued nor presented evidence that the work-release criteria are necessary.  Therefore, the court has not been adequately informed by the department, and must

---

43. While the Eleventh Circuit in Onishea noted that penological interests are relevant in determining whether the plaintiffs meet the essential eligibility criteria of a program, the potential relevance of such concerns does not, of course, absolve the ADOC of the obligation to meet its burden under the ADA.

therefore reserve its decision on this issue to be addressed at a later time.

### 3. The White-Armband Policy

The ADA's prohibition on discrimination is not limited to exclusion from "programs, services, or activities." Bledsoe, 133 F.3d at 821-22. Rather, the ADA "prohibits all discrimination by a public entity, regardless of the context." Id. (emphasis added; citation omitted).[44]

---

44. The ADOC argues that "a plaintiff cannot maintain an ADA claim if the alleged exclusion does not pertain to or involve a service program, or activity." Defs.' Pretrial Br. (Doc. No. 211) at 32 (quotations and citations omitted). However, as the Eleventh Circuit's decision in Bledsoe, supra, reveals, the department is incorrect. The department nevertheless runs with its interpretation, citing, first, a Ninth Circuit case that, by its terms, expressly disagreed with the Eleventh Circuit's opinion in Bledsoe, and, second, the district court's decision in Bledsoe that was reversed on appeal. See Defs.' Pretrial Br. (Doc. No. 211) at 32-33 (relying on Zimmerman v. Or. Dep't of Justice, 170 F.3d 1169 (9th Cir. 1999) and Bledsoe v. Palm Beach Soil and Water Conservation Dist., 942 F. Supp. 1439 (S.D. Fla. 1996)). As these arguments contradict Eleventh Circuit law, the court easily dispenses with them.

The ADOC's policy of requiring male HIV-positive prisoners to wear white armbands implicates this broad prohibition against discrimination.  At trial, the ADOC insisted that the sole purpose of the armbands policy at Limestone is to allow correctional officers to identify easily whether a prisoner is in a dormitory other than the one to which he is assigned (which would implicate legitimate safety concerns).  That justification is not credible.  Cf. United States v. Virginia, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation.").  Throughout Limestone, each dormitory has its own assigned colored armbands.  The sole exception is that the two Special Unit dormitories are both assigned white armbands.  As a correctional officer frankly told the court during its site visit, Limestone staff have no way of knowing whether a prisoner assigned to Dorm B is impermissibly present in Dorm C when he should not be, and vice versa.  The department's justification for the armband policy presents no evidence of its neutrality.

130

The justification (dorm identification) is pretextual, for the white armbands do not identify which dorm (B or C) a prisoner is from but rather identifies the prisoner as HIV-positive.[45]   The policy, therefore, tellingly portrays the ADOC's willingness to discriminate against HIV-positive prisoners and then dress naked discrimination in the guise of neutral policy. Here, the emperor has no clothes.   The purpose of the white armbands has been to identify the HIV-positive prisoners.

Indeed, when combined with the presence of the Special Unit itself, the armbands make disclosure of the prisoners' HIV status all but inevitable.   As Dr. Altice

---

45. During the site visit of Limestone, the court took notice that, in the HIV-negative areas of the prison, large numbers of prisoners were not wearing any armband at all.  Prison officials explained that the HIV-negative prisoners are frequently moved from one dorm to another and there is a time lag between the move and the officials' ability to obtain a new armband.  This substantial failure in effectiveness of the use of armbands among HIV-negative prisoners would seem to support the plaintiffs' contention that armband use was later expanded to HIV-negative prisoners as a cover for the initial discriminatory purpose behind their use for HIV-positive prisoners.  See supra n.10.  Regardless, the court need not rely on this contention.

explained: "If you have an HIV unit within your facility, there just aren't any secrets....  The notion that every time you may be walking out into a yard or with visitors walking by, that somebody may recognize ... that you're the person who's wearing the white arm band," amounts to a constant outing of the prisoners' HIV-positive status. And, regardless of whether or not a person which HIV wishes to disclose his status, voluntary dislosure is different from forced disclosure.[46]

The white armbands are also profoundly stigmatizing. Plaintiff Henderson said: "I feel like it's a tag.... Just like you put a tag on cattles ....  It's branding me.  Everywhere I go ... it sticks out."  Henderson communicated the cumulative effect of the ADOC's treatment of HIV-positive prisoners, from their

---

46. Plaintiff Henderson testified, "I am comfortable with who I am and what I'm dealing with.  HIV doesn't define me .... But I still should have that right to be able to disclose this to whoever I want to disclose it to."  Plaintiff Knox said: "I think that should be our choice and our choice alone who we should disclose [our HIV status] to."

segregation in the Special Unit to the requirement that

they wear white armbands:

> "In Limestone it's like no matter what
> you do, you just there ....  It's like
> ... putting a bunch of fishes in an
> aquarium.  And that's it.  They're just
> in this aquarium, just swimming around
> in this aquarium 24/7, all day long, all
> night, all year....  And ... to be
> placed in this aquarium and have
> individuals outside of this aquarium to
> pass by ... it's like a zoo ... or a
> circus ... where people just pass by and
> ... look at you like you some kind of
> exotic animal ....  When the tours came,
> it was like I was placed in that
> aquarium, and these people came to the
> museum to see exotic fishes.  And the
> guide ... would point their finger
> inside the aquarium at the fishes....
> [O]ne time ... I was outside working out
> ... and a tour came through with some
> young kids ....  And they couldn't tell
> whether or not I was HIV positive ...
> [b]ecause I had a long sleeve shirt
> [which hid the white armband].  They
> stopped, and [the guard giving the tour]
> was pointing towards the dorm, and he
> told the tour, the kids, that this is
> where we house our HIV/AIDS patients....
> And they was like ... amazed, like they
> was looking at some exotic stuff....  I
> want to say something real bad, because
> it touched me....  I am one of these
> people that he's talking about with this

virus, you know, and it hurts.   It
really did.  It hurt[].”[47]

Requiring all HIV-positive prisoners to wear white armbands that disclose their HIV status does not serve a legitimate purpose.  This policy constitutes unlawful, and, indeed, intentional, discrimination under the ADA. <u>Bledsoe</u>, 133 F.3d at 821-22.


### 4. Penological Concerns

The ADOC contends that, even if the plaintiffs show a violation of the ADA, the department will face no liability if it justifies its segregation policies on the basis of legitimate penological concerns.  The department relies on the Supreme Court's holding in <u>Turner v. Safley</u> that a regulation that impinges on constitutional rights

---

47. Henderson’s account recalls Frantz Fanon in his essay, “The Fact of Blackness”: “I found that I was an object in the midst of other objects....   [T]he movements, the attitudes, the glances of the other fixed me there, in the sense in which a chemical solution is fixed by a dye.”  Frantz Fanon, <u>Black Skin, White Masks</u> 109 (Charles Lam Markmann trans., Grove Press 1967) (1952).

is valid so long as it is "reasonably related to
legitimate penological interests."   483 U.S. at 89.
However, as this court has already explained, Turner does
not apply to statutory rights.   See Onishea, 171 F.3d at
1300 (noting that Turner "does not, by its terms, apply
to statutory rights").

This does not mean that the factors identified in
Turner have no relevance.   In Onishea, the Eleventh
Circuit found that the lower court's consideration of
Turner factors did not warrant vacatur, reasoning that it
"seems   obvious   ...   that   the   requirements   for
participation in prison programs are determined in part
by the same 'legitimate penological interests' that
Turner respects in the [constitutional rights] context."
Onishea, 171 F.3d at 1300.   Thus, because of the
substantial   overlap   between   factors   that   must   be
considered in both Turner analysis and ADA analysis, "the
district court could properly use factors such as
Turner's to determine whether the plaintiffs were

135

otherwise qualified to participate in the programs."  Id.
at 1301.

Neither Turner nor Onishea require this court to
treat penological interests as a trump on the plaintiffs'
statutory rights as the ADOC contends it must.[48]  But even
when the court gives full consideration to the ADOC's

_____

48. In Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206
(1998), the first Supreme Court case to affirm the ADA's
application to state prisons, the Court provided entirely
no indication that Turner would apply (nor did the Court
cite Turner a single time), and that case was decided
eleven years after Turner.  Additionally, the Religious
Land Use and Institutionalized Persons Act (RLUIPA)
provides a useful analogy for illustrating Turner's
application to constitutional rights only.  Congress
enacted that statute to afford a greater right of
religious freedom to prisoners than is provided by the
Constitution.  See Cutter v. Wilkinson, 544 U.S. 709,
714-15 (2005) (describing RLUIPA).  Eighteen years after
the Turner decision, in Cutter v. Wilkinson, the Supreme
Court upheld RLUIPA's validity.  Id. at 719-20.  If the
ADOC were correct that any state prison practice that
impinges statutory rights created by Congress is
nevertheless valid if merely reasonably related to
legitimate penological interests, the Court's upholding
of RLUIPA's heightened strict-scrutiny standard for
impingments on religious rights is difficult to square.
See Van Wyhe v. Reisch, 581 F.3d 639, 651 (8th Cir. 2009)
(rejecting the prison officials' "argu[ment] that RLUIPA
violates the doctrine of the separation of powers because
the statute improperly overturns the more deferential
constitutional standard set forth by [Turner]").

136

purported penological justifications, the department
still cannot prevail.  For example, the ADOC argues that
it has a "'legitimate penological interest[]' ... [in]
curtail[ing] the spread of HIV to the general population
inmates."  Defs.' Pretrial Br. (Doc. No. 211) at 55.
That is undoubtedly true, but, as the court has
discussed, it is also true that the ADOC can in fact
effectuate the plaintiffs' rights under the ADA while
simultaneously preventing HIV transmissions.  Cost is
also a legitimate concern.  See Onishea, 171 F.3d at
1300.  However, the court has already found that none of
the accommodations necessary to dismantle the challenged
policies would be unreasonably costly.

The ADOC also argues that its policies are supported
by its penological interests in safety and security
within the prison.  Security is indeed a valid
penological concern, and, pursuant to the Eleventh
Circuit's analysis in Onishea, it can go to whether an
individual is otherwise qualified under the ADA.  Id.
("Security is [a] legitimate interest.").  The department

137

posits that dismantling the segregation policy in housing and in food services would result in violence, placing prisoners and correctional staff at risk.

To support this claim, the department principally relies on a survey conducted by Drs. Brent Maulden and Jerry Ingram.  The two administered their survey in July 2012 to 1,186 prisoners at different correctional institutions throughout Alabama.

Among other results, the survey found that 52.2 % of prisoners believe that acts of violence such as threats, stabbings, and beatings will occur if HIV-positive prisoners are integrated into the general population.  In addition, 39 % expressed agreement with the statement, "I would use force to keep an inmate with HIV away from me." Other results suggest widespread discomfort born of misinformation.  For instance, 62.4 % of prisoners would be concerned about transmission if HIV-positive inmates prepared their food, and 38.5 % answered that it would bother them if an HIV-positive prisoner worked in the laundry and washed their clothes and bedsheets.

Drs. Maulden and Ingram also conducted a survey of correctional officers, surveying 155 officers representing 42 institutions in the ADOC.  That survey's results suggest, above all, that many members of the ADOC correctional staff lack basic understanding of HIV and seem to harbor severe prejudice against those who have it.  Troublingly, 44.4 % responded that they would be less likely to stop acts of violence in the prison if prisoners with HIV were involved.

The plaintiffs' expert on polling, Dr. Faye Taxman, found numerous faults with the survey.  Among them were that Drs. Maulden and Ingram did not follow basic protocols for conducting research on human subjects, that their sampling strategy was inadequate to guarantee a representative sample, and that the questions in the survey were too convoluted to merit confidence in the accuracy of the responses.

Further, Dr. Ingram conducted a nearly identical survey in 1989 when HIV-positive prisoners challenged the ADOC's policy.  That survey predicted that violence would

139

occur if programs were integrated: it did not. This result casts doubt on Dr. Ingram's similar predictions in this case.

However, the greatest damage to the credibility of the survey was done by Dr. Ingram himself at trial. Dr. Ingram testified, for example, that he included questions about the prisoners' attitudes about homosexuality because, "Homosexuality is a high-risk behavior."[49] Dr. Ingram is incorrect to equate sexual orientation to unprotected sexual activity, and his error exemplifies a mutually reinforcing relationship between prejudice

_____

49. Dr. Ingram later corrected himself and said that he meant to say that homosexual acts are high-risk, not homosexual orientation.    Dr. Ingram's deposition transcript shows that when asked how he would respond to the statement, "I would use force to keep a homosexual away from me," he stated, "I would."  According to the transcript, Dr. Ingram answered the question this way in two separate instances.  At trial, Dr. Ingram said that the transcript of the deposition was incorrect in both places where this answer was shown, and that it should have shown that his response was: "I would not."  The court finds both Dr. Ingram's claim that the transcript was incorrect and his post-hoc corrections of his statements disingenuous.  It was evident from both his testimony and his demeanor in editing his own words that Dr. Ingram harbors prejudice against homosexual people.

against HIV and homophobia.  The court was disturbed by his attitudes.  More pertinently, because much of the survey assessed attitudes about homosexuality, the court is concerned that the study was tainted by Dr. Ingram's own biases.  Therefore, while the court considers the results of the survey, it lends them only limited credence.

Even if the study were an exemplar of professional integrity (and it is not), its results do not show that violence would necessarily result if the ADOC changed its policy.  This conclusion can only be drawn when the study's results are coupled with the fatalistic assumption that potential backlash cannot be prevented.

The evidence, however, reveals that this is not the case.  There was not significant unrest, for instance, when the ADOC integrated HIV-positive prisoners into various programs and activities, although department officials, including Associate Commissioner DeLoach,

feared that violence would occur.[50]  Deputy Commissioner
Emmitt Sparkman attests to a similar result when the
Mississippi Department of Corrections integrated its HIV-
positive prisoners in 2010: though violence was
anticipated, none, in fact, took place.  Sparkman credits
this success to a robust education effort that the
Mississippi Department of Corrections conducted in
anticipation of integration.  And indeed, since the
results of the prisoners' survey revealed widespread
misinformation about how HIV is spread, it it imminently
possible that education would both dispel these
assumptions and reduce the fear (and the potential
violent backlash) that accompany them.

The ADOC has an equally scant basis for assuming that
correctional officers could not be educated to better
address potential unrest.  Moreover, the ADOC has a

_____

50. Based largely on Dr. Ingram's survey, ADOC argued
that violent backlash would result from program
inegration in Onishea, interpreting the evidence to show
"that residential and program integration would be
equally objectionable to certain inmates."  Onishea, 171
F.3d at 1300.

responsibility to ensure that its officers are informed and would treat all prisoners equally.  Therefore, if correctional officers really would hesitate to break up fights involving HIV-positive prisoners, then the appropriate response is certainly not to accommodate it.

Indeed, rather than justifying the ADOC's policy, the correctional officers' responses to the survey instead provide strong evidence that prejudice against prisoners who have HIV is prevalent within the department.  And as a general matter, the department's arguments about the results of the survey (which suggested that bias, misinformation, and homophobia are persistent problems within the ADOC) demonstrate the ADOC's willingness to defer to prejudiced viewpoints rather than correct them. Associate Commissioner DeLoach's testimony on the potential threat of violence exemplifies this approach:

> "DELOACH: Inmates still have this mindset that HIV-positive offenders--in large part, they equate that to homosexual activity.

> "THE COURT: So the real animating trait here is really not the HIV-positive quality, but the gay quality.

> "DELOACH: Yes, sir."

Associate Commissioner DeLoach testified that this impacted his assessment of whether HIV-positive inmates could be safely housed in cells with prisoners who do not have HIV.  Thus, DeLoach demonstrated a willingness to allow homophobia to drive the department's policy with regard to HIV-positive prisoners.

Despite this, however, Associate Commissioner DeLoach largely testified directly against the ADOC's position on security justifications for its policy.  According to DeLoach, today, there is no security reason that HIV-positive prisoners could not share open bay dormitories with general-population prisoners at Limestone.  He testified that he now has no concerns about integrating HIV-positive prisoners at Tutwiler.  He is also concerned about integration at facilities other than Limestone, but believed that an incremental process accompanied by education could allow the department to integrate

successfully at those facilities as well.   Integration
could be achieved, he said, as long as the process is
"slow and gradual."   That the very man responsible for
implementing the segregation policy (and a person who has
not shied away from accommodating prejudice) finds no
security   justification   today   for   maintaining   it
discredits deeply the department's insistence that its
approach is essential to the safety and good operation of
the prison system.   DeLoach's last-minute concessions
also deepen the court's impression that the ADOC's policy
has stood on stale assumptions.

In sum, the ADOC has not demonstrated that intgrating
the plaintiffs in housing or including them in food-
service jobs would create a serious threat of disorder;
the court's conclusion that the plaintiffs are not
categorically unqualified therefore remains in tact.
Even if the court were to apply Turner formally, it would
not find the ADOC's current segregation policies
justified.   To the extent that violence is a credible
concern, the "existence of ... ready alternative[s]",

145

such as education, renders segregation precisely the sort

of "'exaggerated response' to prison concerns" that the

<u>Turner</u> doctrine is not intended to shield.  <u>Turner</u>, 482

U.S. at 90.


### C.  <u>Res Judicata</u>

The court now turns to a defense asserted by the ADOC

at early stages of this litigation.  The court set this

issue aside for further factual development at trial.

<u>See</u> <u>Henderson v. Thomas</u>, ____ F. Supp. 2d ____, 2012 WL

3846439, at *6 (M.D. Ala. 2012) (Thompson, J.).  The ADOC

contends that the plaintiffs' claims under the ADA are

identical to those adjudicated in <u>Onishea</u> and <u>Edwards</u>,

and are thus precluded from relitigation in this case

under the doctrine of <u>res judicata</u>.

<u>Res judicata</u> bars a subsequent action where four

elements are satisfied: "(1) a final judgment on the

merits, (2) rendered by a court of competent

jurisdiction, (3) the parties, or those in privity with

them, must be identical in both suits, and (4) the same

146

cause of action must be involved in both cases." <u>Hart v.</u>
<u>Yamaha-Parts Distribs., Inc.</u>, 787 F.2d 1468, 1470 (11th
Cir. 1986) (citations omitted).  The plaintiffs concede
that the first three elements are met.  However, they
contend that the fourth element is not satisfied because
the underlying facts have changed.

In determining whether two causes of action are
identical for the purposes of <u>res judicata</u>, the court
must consider "not only whether the same legal claim is
asserted, but also whether the factual underpinnings of
the causes of action are constant." <u>Edwards</u>, 81 F. Supp.
2d at 1249.  Thus, "in determining whether to apply <u>res</u>
<u>judicata</u>, [the court] must look to the factual issues to
be resolved in the second cause of action, and compare
them with the issues explored in the first cause of
action.  If there has been a modification of significant
facts creating new legal conditions, <u>res judicata</u> is no
defense." <u>Southeast Fla. Cable, Inc. v. Martin County</u>,
173 F.3d 1332, 1336 (11th Cir. 1999) (punctuation marks
and citations omitted).

147

Here, the plaintiffs argue that the "central factual premise of the _Onishea_ decision--that HIV infection inevitably progresses to AIDS and then to death--is no longer true." Pls.' Br. (Doc. No. 37) at 3.   As the court has already concluded, that is correct.   HIV is no longer inevitably fatal.   Because the _Onishea_ court's holding hinged on this fact, _Onishea_ cannot preclude the plaintiffs from litigating the case at issue here.

In addition, the ADOC has significantly changed its policy with regard to HIV-positive prisoners since _Onishea_ was litigated.   These changes include abandoning policies that the ADOC argued in _Onishea_ were necessary to protect the safety of all prisoners within the system.[51]   Therefore, the ADOC's own actions are poweful evidence that circumstances since _Onishea_ have significantly changed.

---

51. The district court in the _Onishea_ litigation "concluded that the transmission risk [was] significant in all programs." _Onishea_, 171 F.3d at 1295.

It is clear, then, that the factual underpinnings of this action are different from those in Onishea.   In Edwards, this court dismissed the lawsuit as an attempted relitigation of the Onishea claims; thus, if this case is not precluded because of Onishea, nor is it precluded because of Edwards.   Res judicata is therefore no bar to this suit.


## III. RELIEF

Having decided the ADOC's liability, the court now turns to the issue of appropriate relief.   The Prison Litigation Reform Act requires that the relief imposed be "narrowly drawn, extend[] no further than necessary ..., and [be] the least intrusive means necessary to correct the violation of the Federal right[s]."   Brown, 131 S. Ct. at 1929 (quoting 18 U.S.C. § 3626(a)(1)(A)). At the end of the trial in this case, the court promised that, should it find in favor of the plaintiffs on liability,  it would afford the defendants an opportunity to propose appropriate relief to the court and that this

149

opportunity would include time for both sides to meet and attempt to agree upon relief.  The court will keep its promise.  <u>Cf</u>. <u>Davoll v. Webb</u>, 194 F.3d 1116, 1132 n.8 (10th Cir. 1999) ("The federal regulations implementing [Title I of] the ADA envision an interactive process that requires participation by both parties....  Both parties thus have an obligation to interact in good faith to determine how to reasonably accommodate the employee.") (quotation marks and citations omitted).


***


In conclusion, the court holds that, except as to the work-release policy, the ADOC's HIV-segregation  policy violates the ADA.  In reaching this holding, the court will emphasize three points.

First, the court finds that the segregation policy is based on outdated and unsupported assumptions about HIV and the prison system's ability to deal with HIV-positive prisoners.  The policy is also infected, and the reasons

the ADOC has proffered for its continued existence
undermined, by an intentional bias against HIV-positive
people, as reflected in a bias from those in charge (for
example, with the white-armband policy) and in a system-
wide tolerance for a culture of bias, rooted in large
measure in ignorance about HIV, from among not only
prisoners but employees in general (for example, with the
food-service policy and the fear that guards will not
protect HIV-positive prisoners).  More specifically, in
response to the question of why the ADOC continued to
exclude HIV-positive prisoners from food-service jobs in
the prison kitchens and in the work-release program when
it was clear that HIV was not transmitted by handling
food and when there had been no complaints from employers
about HIV-positive prisoners having food-service jobs,
Associate Commissioner DeLoach responded: "[W]e live in
Alabama, and there are a lot of prejudices....  [I]t
doesn't sound nice.  It doesn't sound ... chic....
Prejudices ... die hard in Alabama."  Therefore, any

remedy the defendants might propose to the court must be based not only on a willingness to revisit assumptions and to look to all reasonably available and untapped resources; and must not only be uninfected by bias against those with HIV, but it must also address the lack of education and ignorance among both prisoners and prison employees about HIV.  "We live in Alabama" is not an excuse.

Second, the court cannot overemphasize that it is not holding that all HIV-positive prisoners are entitled to be co-mingled with HIV-negative prisoners; indeed, the court is not even holding that any particular HIV-positive prisoner is entitled to such.  Rather, the court is simply holding that how prisoners should be treated based on their HIV-positive status must depend upon an individual-by-individual assessment of these prisoners that honors each prisoner's rights under the ADA, and the court is convinced that resources are reasonably available to do this.  The essential thrust of this

court's opinion today is simply that the ADOC must look at each HIV-positive prisoner separately and individually based upon that prisoner's particular circumstances.

Third and finally, the court will address later and by a separate order how the parties are to proceed as to the unresolved challenge to the ADOC's work-release policy.

An appropriate judgment will be entered.

DONE, this the 21st day of December, 2012.


      /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE