IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| LOUIS HENDERSON, DANA<br>HARLEY, ALBERT KNOX, JAMES<br>DOUGLAS, ALQADEER HAMLET,<br>and JEFFREY BEYER, on<br>behalf of themselves and<br>of those similarly<br>situated, | ) ) ) ) ) ) ) ) | |
|     Plaintiffs, | ) ) | |
|     v. | ) ) ) | CIVIL ACTION NO.<br>2:11cv224-MHT<br>(WO) |
| KIM THOMAS, Commissioner,<br>Alabama Department of<br>Corrections; BILLY<br>MITCHEM, Warden, Limestone<br>Correctional Facility;<br>FRANK ALBRIGHT, Warden,<br>Julia Tutwiler Prison<br>for Women; BETTINA CARTER,<br>Warden, Decatur Work<br>Release/ Community Work<br>Center; EDWARD ELLINGTON,<br>Warden, Montgomery Women's<br>Facility, in their<br>official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
|     Defendants. | ) | |

<u>OPINION</u>

The plaintiffs in this lawsuit, representing a class

of all current and future HIV-positive prisoners

incarcerated in Alabama Department of Corrections (ADOC) facilities, challenge the ADOC's policy of categorically segregating HIV-positive prisoners from the general prison population and denying the plaintiffs the opportunity to be considered for various rehabilitative services and programs offered to other prisoners. They have named as defendants ADOC Commissioner Kim Thomas and the wardens of the four ADOC facilities that house HIV-positive prisoners.

In December 2012, this court ruled that the HIV-segregation policy discriminates against HIV-positive inmates on the basis of a disability (HIV status) in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. See Henderson v. Thomas, 913 F. Supp. 2d 1267 (M.D. Ala. 2012) (Thompson, J.). The court instructed the parties to meet and attempt to agree on relief. On August 1, 2013, the parties returned to the court with a motion for the court to

2

approve preliminarily two proposed joint settlement agreements: a primary agreement, which would be enforceable in this court, and a private agreement, which is enforceable only in state court under principles of contract law. Joint Mot. for Prelim. Approval and Notice of Proposed Settlement (Doc. No. 284).

Based on careful consideration of the proposed settlement agreements, the objections to the agreements, and the representations by counsel and after two fairness hearings held at the prisons that house the majority of current class members, the court will approve the proposed settlement agreements and enter the parties' stipulated order.

## I. BACKGROUND

In the late 1980s, the ADOC began to test inmates for HIV and to segregate those inmates who tested positive. The department took these steps amidst a climate of fear regarding HIV and AIDS. Scientists were not yet certain

3

as to how HIV was transmitted, and, since the infection was so new, there were not yet adequate treatments. To many, HIV infection seemed like an automatic death sentence.

Soon after Alabama began segregating HIV-positive inmates, a group of inmates filed suit challenging the policy. After years of litigation, both this district court, see Harris v. Thigpen, 727 F. Supp. 1564 (M.D. Ala. 1990) (Varner, J.), and Eleventh Circuit Court of Appeals, see Onishea v. Hopper, 171 F.3d 1289 (11th Cir. 1999), found that segregation of HIV-positive prisoners was justified--primarily based on the dangerousness of HIV infection.

Today, the prognosis for a person who contracts HIV has changed drastically. With proper treatment, a person with HIV can live as long as one without HIV, and the danger that he will infect another is much lower. In light of this changing medical reality for people with HIV, this court held that the ongoing policy of

4

segregating HIV-positive inmates violated the Americans with Disabilities Act and the Rehabilitation Act. <u>Henderson v. Thomas</u>, 913 F. Supp. 2d 1267 (M.D. Ala. 2012) (Thompson, J.).

In early 2013, the parties began to develop a remedial plan, and, in June 2013, the parties entered into formal mediation with Magistrate Judge Wallace Capel, Jr. On July 30, the parties reached an agreement to settle all remaining claims with two agreements: a primary agreement enforceable in federal court and a private agreement enforceable in state court. On August 1, the parties filed a joint motion to ask the court to adopt, preliminarily, the agreements, both of which are signed by plaintiffs' counsel and defendant Kim Thomas, Commissioner of the Alabama Department of Corrections.

On August 6, 2013, the court granted the motion to approve the two settlement agreements preliminarily. The court further approved the parties' plan for notifying

class members of the proposed settlement and for soliciting and receiving class members' feedback.

The court held two fairness hearings on the proposed settlement. On September 24, 2013, the court held a fairness hearing at Tutwiler Prison, during which the court heard testimony from class representative Dana Harley, two other members of the class, and Warden Bobby Barrett. Two days later, on September 26, the court held a fairness hearing at Limestone Correctional Facility, during which the court heard testimony from class representative Jeffrey Beyer, six other members of the class, and Captain Guy Noe.


## II. DESCRIPTION OF PROPOSED SETTLEMENT

The proposed settlement consists of two agreements: a primary agreement, enforceable in this court, and a private agreement, enforceable in state court.

The primary agreement ends the practice of segregating HIV-positive inmates within facilities. The

6

agreement further allows for HIV-positive inmates to be
eligible for assignment to ten additional facilities
within the ADOC system, and it ends the HIV-specific
restrictions on work-release.[1] Incoming prisoners who test
positive for HIV will no longer be sent to an isolation
cell. The parties agree that the ADOC will train staff,
inmates, and medical providers about HIV before HIV-
positive inmates are transferred to new facilities. To

------

1.   ADOC facilities are separated by gender. Before
this litigation, women with HIV were assigned to Tutwiler
Prison (the only women's prison in the system) and to
Montgomery Women's Center for work release. The primary
agreement allows for women to be placed at Birmingham
Work Release, the final remaining women's facility in the
ADOC system.

There are many more ADOC facilities for men. Before
this litigation, a man with HIV would arrive at Kilby
Correctional Facility for classification. He could then
be sent only to Limestone Correctional Facility or
Decatur Work Release. The primary agreement enables an
HIV-positive inmate to be transferred to Donaldson
Correctional Facility, Fountain Correctional Facility,
Loxley Work Release, Staton Correctional Facility,
Bullock Correctional Facility, Elmore Correctional
Facility, St. Clair Correctional Facility, Mobile Work
Release, and Red Eagle Work Center.

ensure that inmates who have HIV continue to receive necessary treatment, the ADOC will install telemedicine units in certain facilities and will maintain an Acute Care Unit at Limestone. The ADOC will take several steps to protect inmates' medical confidentiality and will establish a zero-tolerance policy for harassment of HIV-positive prisoners, including ending the practice of making inmates wear armbands that correspond to their HIV status. The primary agreement establishes a schedule for implementing these changes and provides for a monitoring and dispute-resolution regime.

The private agreement expands the provisions of the primary agreement to all of the ADOC's facilities, fully desegregating prisoners with HIV and allowing the ADOC to remove HIV status from prisoners' non-medical files.

Both agreements expire on June 30, 2015, unless the agreement is extended by the parties or the primary agreement is extended by order of the court. (The private agreement provides that it will last as long as the

8

primary agreement does.) The primary agreement also provides for the ADOC to pay $ 1.3 million in attorney's fees and costs to class counsel.


## III. DISCUSSION

Judicial policy favors voluntary settlement of class-action cases. <u>Bennett v. Behring Corp.</u>, 737 F.2d 982, 986 (11th Cir. 1984). However, the court retains a role in the evaluation and approval of settlements, including ensuring that any settlement complies with all relevant law. There are three provisions that require this court's review. First, Federal Rule of Civil Procedure 23(e) provides for both procedural steps and substantive standards which must be satisfied before the court can approve a class action settlement. Second, the Prison Litigation Reform Act of 1996 establishes certain requirements for prospective relief in cases involving prisons, including when that prospective relief takes the form of a court-enforceable settlement. 18 U.S.C.

§ 3626(a)(1) & (c)(1). Finally, because the proposed settlement includes an award of attorney's fees to plaintiffs' counsel, Federal Rule of Civil Procedure 23(f) requires that the court find that such a fee award is "reasonable" and provides for a procedure to do so. The court will take up each of these requirements in turn.


### A. Rule 23(e)

Before approving a settlement agreement in a class action, "a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" Laube v. Campbell, 333 F. Supp. 2d 1234, 1238 (M.D. Ala. 2004) (Thompson, J.). This review is "essential to ensure adequate representation of class members who have not participated in shaping the settlement." Fed. R. Civ. P. 23(e) advisory committee's note. In its review of the settlement, the court must determine whether notice to the class was adequate, Fed. R. Civ. P. 23(e)(1), and

must examine comments and objections from the members of the class, as well as the opinion of class counsel. Laube, 333 F. Supp. 2d at 1238.


### i. Notice

"The court must ensure that all class members are informed of the agreements and have the opportunity to voice their objections." Laube, 333 F. Supp. 2d at 1246; Fed. R. Civ. P. 23(e)(1). In this case, plaintiffs' counsel and the defendants provided many opportunities for members of the class to learn about the proposed settlement and to offer objections and comments about it. Between August 9 and 13, 2013, the defendants hand delivered to each member of the class a copy of the proposed settlements, a notice summarizing the proposed settlement, and a form for objections to the settlement. In an evidentiary submission, the defendants provided documentation of this notice to class members at Kilby, Decatur Work Release, and Montgomery Women's Center. Exs.

11

B to Billups, Ellington, and Files Affs. (Doc. Nos. 300-3, 300-6, 300-9). They further provided documentation for class members at Tutwiler and Limestone at the hearings on September 24 and 26, 2013. Defs. Exs. 1 and 3.

Class counsel visited each of the five facilities housing class members during the week of August 19, 2013. Counsel made efforts to schedule their meetings such that a majority of the class was able to attend, and they discussed the settlement extensively. The court finds that these measures were sufficient to satisfy Rule 23(e)(1)'s notice requirement.

## ii. Objections and Comments

Twenty-seven class members submitted objections and comments to the proposed settlement. Of these, 24 were submitted from Limestone Correctional Facility, two were submitted from Tutwiler Prison, and one was submitted from Montgomery Women's Facility.

Five of the class members who submitted comments included an explicit statement in favor of the settlement, although two of them also had concerns about specific aspects of the settlement. Most of the other objectors seemed to approve implicitly the general structure of the settlement. However, one objector was concerned that the desegregation itself would undermine the success and privileges he had earned in segregated confinement.

The court could identify 44 discrete comments and objections in submissions from 27 different inmates. Five of these comments were statements of support for the settlement. The remaining comments fell into six general categories: money damages, medical care, the process of reclassification, speed of implementation, confidentiality, and other issues.

Money Damages: Nine inmates wrote that they believed that their treatment entitled them to monetary compensation and that they were disappointed that there

13

was no provision for such compensation in the settlement.[2] While § III.A of the primary settlement agreement does not entitle members of the class to monetary compensation, it does not preclude class members from seeking compensation in a future suit.

Since the complaint, this litigation has not contained a claim for money damages. Furthermore, this class was certified as under Fed. R. Civ. P. 23(b)(2). Memorandum Opinion and Order (Doc. No. 188). That section of Rule 23 is available for only suits that primarily seek injunctive or declaratory relief, and a court can only offer monetary relief that is "'incidental' to the claims for equitable and declaratory relief." Cooper v. Southern Co., 390 F.3d 695, 720-21 (11th Cir. 2004).

---

2.   One of these inmates was particularly displeased that the plaintiffs' attorneys would receive $ 1.3 million in compensation, while the class members would not receive any monetary compensation. The court finds that the amount of attorney's fees is reasonable given the work performed by the attorneys. See infra, § III.C

The court recognizes the class members' legitimate senses of grievance for the treatment to which they were subjected. However, "this set of objections must be balanced against the substantial benefits plaintiffs will derive from the settlement agreement, as well as with the fact that the objectors are permitted to file or maintain their actions for monetary damages." Austin v. Hopper, 28 F. Supp. 2d 1231, 1237 (M.D. Ala. 1998) (Thompson, J.) (quotation marks and ellipsis omitted).

Medical Care: Six of the comments raised concerns about health-care access. Three of these comments involved care for conditions unrelated to HIV. These comments alleged inadequate care for mental illness, cancer, ulcers, and breast reduction. Since these issues of general access to health care are not at the core of this litigation, the settlement is not unfair or unreasonable for failing to address these concerns.

However, three of those comments focused specifically on access to HIV-related care. One class member was

15

concerned that other facilities may not have HIV
medications on hand and that this would disrupt the
consistent treatment that allows many inmates to stay
healthy. Another class member wanted to ensure that
medical staff would take his "sick calls" seriously,
whether they involved simple diagnoses or more complex
issues. A third class member was worried about the
proposal to use telemedicine to provide HIV care in some
facilities. He pointed out that other inmates may notice
who uses the telemedicine facilities, inadvertently
revealing the inmate's HIV status.

The proposed settlement takes several steps to ensure
that class members will have consistent access to medical
care. Each primary-care clinician at a facility housing
an inmate with HIV will receive training on HIV care from
the University of Alabama at Birmingham's 1917 Clinic.
§ II.E.4. Furthermore, before the ADOC will transfer an
HIV-positive inmate to a new facility which is not able
to provide in-person HIV-specific consultation, the ADOC

will install telemedicine units. Since the ADOC intends
to use those telemedicine units to provide access to a
wide range of specialist medical providers, an inmate's
use of the units would not necessarily imply that he was
HIV-positive. In testimony at the September 26 fairness
hearing, the ADOC informed the court of its system for
providing for inmates' pharmaceutical needs during
transfers. This system ensures that all inmates with
chronic disease, including those with HIV, receive their
prescriptions. The proposed settlement also establishes
a designated procedure for complaints that an inmate is
not receiving his HIV medication. While many class
members expressed concern that the settlement's complaint
process would be too slow to address urgent
pharmaceutical needs, there are several internal
complaint mechanisms which an inmate could use to address
an issue with his pharmaceutical or medical care. The
court finds that these provisions will sufficiently

ensure that members of the class will receive their medications and adequate care.

Reclassification Process: Seven of the comments raised an issue with the process by which inmates who have HIV will be reclassified. These class members objected based on an understanding that all of the male inmates who have HIV will be transferred to Kilby Correctional Facility and then reclassified from that location. Two of the comments expressed concern that a reclassification through Kilby will indirectly signal to many other inmates and prison staff that the inmates who are being reclassified have HIV. Another comment associated Kilby with the past trauma of being diagnosed with HIV and immediately placed in solitary confinement.

At the September 26 fairness hearing, there was extensive explanation of the proposed transfer process from Limestone. Although the ADOC at one point proposed that all of the male class members would be re-classified through Kilby in one large group, the current plan is for

18

the class members to be re-classified in the same manner
as any other prisoner. If a class member has been
disciplinary-free for the six months prior to transfer,
he can make a lateral transfer request for a particular
facility. As a part of its general transfer process, the
ADOC takes these requests into consideration, but does
not guarantee that they will be honored. If a class
member is not disciplinary free at the time of transfer,
he will be transferred according to the ADOC's needs.
Although this process is not articulated in either
settlement agreement, the court finds that it addresses
the class members' objections and has confidence in the
ADOC's good faith in the representations that were made
at the September 26 hearing.

Confidentiality: Five class members expressed concern
that, even with full implementation of the settlement,
their HIV status would be made public. One class member
expressed concern that there would be backlash among
prison staff or other inmates, which would lead those

19

staff or inmates to reveal his status. Others were concerned that HIV-negative inmates from Limestone may end up in the facility to which he will be transferred and that those inmates will reveal his status to others. All five inmates expressed some collateral concern that the revelation of their HIV status could lead to conflict or violence from other inmates.

The court notes that the settlement includes several provisions to address the risks of noncompliant staff or inmates who may breach medical confidentiality or harass inmates who have HIV. First, all inmates and staff will receive training on HIV and the settlement. Also, the Commissioner issued directives on September 3 that establish a zero-tolerance policy for harassment of HIV-positive inmates. The directives also provide for disciplinary sanction of any staff member who violates the medical confidentiality of an inmate by revealing his HIV status. If class counsel learn that the ADOC is failing to implement these policies fully, they can begin

20

mediation with Magistrate Judge Wallace Capel, as provided by each agreement, and, if mediation does not solve the problem, can seek an order from the court. The court finds that this enforcement structure will adequately protect inmates from malicious or negligent violation of their medical confidentiality, as well as any corresponding harassment.

Speed of Implementation: Four class members objected to the speed at which the settlement process is scheduled to proceed. Two of these objectors noted that Mississippi recently desegregated its HIV-positive inmates more quickly. One inmate at Limestone noted that, as of August 19, the facility was still using armbands which indirectly identified inmates as being HIV-positive. In fact, as of the September 26 hearing, class members were still wearing these armbands. An inmate at Tutwiler noted that, as of August 20, she was still being held from work release. However, at the September 24 hearing, that class member, B.G., testified that she had

been allowed on work release after she had sent her objection.

When considering a settlement, the court must weigh criticisms against the risks of proceeding without settlement. "A settlement is in large measure a reasoned choice of certainty over a gamble." <u>Paradise v. Wells</u>, 686 F. Supp. 1442, 1446 (M.D. Ala. 1988) (Thompson, J.). Even in a case where the court has adjudicated most issues of liability, it can take a court significant time to craft injunctive relief when the parties cannot develop an adequate settlement. While the court takes into consideration these class members' sense of urgency with regard to changes in their conditions of confinement, rejecting this settlement would in fact exacerbate the class members' concerns.

<u>Other Issues</u>: The remaining seven comments concerned a wide range of issues. Two objectors were utilizing the programming options which were available in the segregated facilities and feared that, after

desegregation, they would be put at the bottom of long waiting lists for access to similar programming. One objector was concerned that the settlement would lead to his transfer to a higher-security facility, which would expose him to more violence at the hands of other inmates. One objector expressed concern that the settlement will not change the behavior of guards who may still carry a strong anti-HIV bias. An inmate felt that he had not been given a fair chance to review the settlement. Another objector was concerned that the parole board may inappropriately use his status to deny him parole.[3] Finally, an objector complained about the food at Limestone, in part because he was concerned that he receive a medically adequate diet.

After reviewing the written objections and testimony of class members and after a close examination of the

---

[3]. The Alabama Board of Pardons and Paroles is not a party to this litigation. To the extent that parole boards are inappropriately taking HIV status into account in their parole decisions, that issue would not be addressed by this litigation or this settlement.

23

proposed settlement agreements, the court finds that full implementation of the agreements will resolve the majority of the concerns. While some of the class member's concerns will remain, the court finds that the benefits that the settlement will confer on the plaintiffs outweigh these residual concerns.

### iii. View of Class Counsel

In addition to considering the views of class members, the court should also consider the opinion of class counsel. Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1215 (5th Cir. 1978);[4] Gaddis v. Campbell, 301 F. Supp. 2d 1310, 1315 (M.D. Ala. 2004) (Thompson, J.).

---

4.   The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981, and all Former Fifth Circuit Unit B and non-unit decisions rendered after October 1,1981. See Stein v. Reynolds Secur., Inc., 667 F.2d 33, 34 (11th Cir. 1982); Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc).

24

Plaintiffs' counsel agreed to this settlement only after this court's judgment in their favor on the issue of liability. Over the more than three years since counsel first began to investigate this case, counsel conducted dozens of interviews with members of the class, and they consulted with numerous experts on prison administration and HIV care. Pls. Br. In Support of Mot. For Attorney's Fees and Costs (Doc. No. 257) at 11-12. In fact, counsel themselves are experts in prison litigation (including the restrictions imposed by the Prison Litigation Reform Act, <u>see</u> <u>infra</u>) and in litigation on behalf of people with HIV. These attorneys, taking into account both their own experience and the opinions of experts, conclude that the settlement is fair, adequate, and reasonable.

Settlement negotiations between the parties were conducted at arms length, and there is no indication that the parties colluded in drafting this settlement. The

25

court takes seriously the view of class counsel that the
settlement is fair, adequate, and reasonable.

   iv. Court's Assessment of the Settlement Agreements

      The court must now assess for itself whether the
settlement is fair, adequate, and reasonable. "Relevant
factors include the stage in the proceedings; the
plaintiffs' likelihood of success at trial [on remaining
issues]; the complexity, expense, and likely duration of
the lawsuit; and the range of possible recovery." Laube,
333 F. Supp. 2d at 1246.

      The parties reached the proposed settlement after a
trial in which the plaintiffs prevailed on nearly all
questions of liability. However, for the court to develop
injunctive relief absent such a settlement would require
the expense of significant time, effort, and money by the
parties and time and effort by the court. Such a process
would also significantly delay relief for the members of
the class.

                              26

In light of these factors and after a careful and independent review of the proposed settlement agreements, the court is satisfied that they are a fair, adequate, and reasonable resolution to this litigation.

## B. Prison Litigation Reform Act

"The PLRA strictly limits the prospective relief a federal court may order in cases concerning prison conditions." Gaddis, 301 F. Supp. 2d at 1313. The PLRA's restrictions extend to consent decrees. 18 U.S.C. § 3626(c)(1). However, private settlement agreements that are only enforceable in state court do not need to abide by the PLRA's requirements. 18 U.S.C. § 3626(c)(2). In this case, the parties have developed two agreements. The primary agreement is enforceable by this court and is therefore a consent decree, governed by the PLRA. The private agreement, on the other hand, does not require a PLRA analysis.

The PLRA provides that "a court shall not grant or approve any prospective relief unless the court finds that such relief [(1)] is narrowly drawn, [(2)] extends no further than necessary to correct the violation of a Federal right, and [(3)] is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).  The court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(B).

The PLRA generally requires that the court "engage in a specific, provision-by-provision examination of [a] consent decree[], measuring each requirement against the statutory criteria." Cason v. Steckinger, 231 F.3d 777, 785 (11th Cir. 2000). However, "[t]he parties are free to make any concessions or enter into any stipulations they deem appropriate," and the district court does not need to "conduct an evidentiary hearing about or enter

particularized findings concerning any facts or factors about which there is not dispute." Id. at 785 n.8.

In this case, the parties all agree that the consent decree satisfies the so-called "need-narrowness-intrusiveness" requirements of the 18 U.S.C. § 3626(a)(1)(A). They stipulate accordingly in § III.F of the primary agreement. The court would note that this stipulation is particularly justified, given the agreement's short time frame and its application to only a limited number of the ADOC's facilities.

The court further finds that the primary agreement will have no adverse effect on public safety or the operation of the criminal-justice system. See 18 U.S.C. § 3626(a)(1)(B). In fact, by integrating HIV-positive inmates within the ADOC's normal structure of housing and programming, it may even be easier to maintain order and security among those inmates with HIV, as opposed to the current system which offers guards and wardens few

carrots and a limited range of sticks to address inmates'
behavior.

In sum, the court is satisfied that it is in full
compliance with the PLRA in approving the primary
agreement.


### C. Rule 23(h)

Rule 23(h) "provides a format for all awards of
attorney fees and nontaxable costs in connection with a
class action." Fed. R. Civ. P. 23 advisory committee's
note.  The rule requires that the attorneys seeking fees
and costs "that are authorized by law or by the parties'
agreement" move for those fees and provide notice to the
class. Fed. R. Civ. P. 23(h)(1). After allowing for class
members or defendants to object to the award of fees, the
court must make findings of fact and conclusions of law
that the award sought is reasonable. Fed. R. Civ. P.
23(h)(2)-(3).

Under the proposed settlement, counsel would receive $ 1.3 million in attorney's fees and costs. As noted above, one class member objected to the amount of attorney's fees.

In their statement in support of the proposed settlement, class counsel referred the court to their documentation of fees and costs that was filed on January 4, 2013. Pls. Br. In Support of Mot. For Attorney's Fees and Costs (Doc. No. 251). At that time, plaintiffs' attorneys properly moved, in accordance with Fed. R. Civ. P. 54(d)(2), for approximately $ 2.1 million in attorney's fees and $ 248,230 in non-taxable costs. The court finds that this motion, with the notice of the fee award in the settlement notice, satisfies the procedural requirements of Fed. R. Civ. P. 23(h)(1).

The court has a responsibility to assess independently the reasonableness of an attorney-fee award, even when both parties agree to the award. Piambino v. Bailey, 610 F.2d 1306, 1328 (5th Cir. 1980).

31

This court uses the lodestar approach to determine whether a proposed award of attorney's fees is reasonable. Norman v. Housing Auth. Of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988). Under the lodestar method, "the starting point in any determination [of fees] is to multiply hours reasonably expended by a reasonable hourly rate" to determine the 'lodestar.' Id. "After the lodestar is determined ... the court must next consider the necessity of an adjustment." Id. at 1302. "In determining the lodestar figure and whether it should be adjusted upwards or downwards, the court is guided by the 12 factors set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th

32

Cir. 1974)."[5] <u>Simpleville Music v. Mizell</u>, 511 F. Supp. 2d 1158, 1161 (M.D. Ala. 2007) (Thompson, J.).

Plaintiffs' counsel present thorough documentation of the hours spent on this case. Pls. Br. in Support of Mot. For Attorney's Fees and Costs (Doc. No. 257 and Exhibits). They further provide extensive evidence that their proposed rates represent the market rate for attorneys of counsel's caliber working on a case of this complexity.(The court notes in passing that counsel seek fees pursuant to 42 U.S.C. § 12205 (ADA) and 29 U.S.C. § 794a (Rehabilitation Act). As a result, their fees are not limited by the PLRA's restriction on hourly rates for

---

5. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>Id.</u>

prison litigation, which concerns cases "in which attorney's fees are authorized under section 1988." 42 U.S.C. § 1997e(d)(1).) Counsel's calculations establish a lodestar of $ 1,955,218.05

The agreement provides for fees (and costs) of $ 1,300,000, which equates to an adjustment of 66.5%, approximately two-thirds. Absent an agreement between the parties, the court would not adjust the lodestar downward so drastically. Plaintiffs' counsel took on a case with three stigmas: the stigma attached to HIV, the stigma attached to prison-reform litigation, and finally, a consensus among many attorneys that these claims were barred by res judicata. Navigating legal and logistical challenges, counsel prevailed as to liability and have reached a settlement which addresses the concerns of the class. In light of these challenges and counsel's effort, the court finds that $ 1,300,000 is a reasonable amount for attorney's fees and costs.

34

## IV. CONCLUSION

This settlement is by no means perfect, and it will not provide the members of the class with everything that they could possibly desire. The court heard as much at the fairness hearings, particularly at Limestone. However, the settlement will nonetheless make a large difference for the members of the class. As class representative Dana Harley testified:

> "[W]e've been waiting for this for a long time. We've talked about it over the years. And just being able to be looked at as an individual and not based on where I live or where I sleep or where I work due to my HIV status, that's a big change."

Over the decades of litigation on this issue, there are many individuals who have helped make this "big change" happen. The court wishes to acknowledge these individuals.

First, the court acknowledges the dedication and hard work of Dana Harley, Jeffrey Beyer, and all of the other class representatives past and present. At the fairness hearings, the court heard the extent of the hard work that

the representatives undertook: serving as a conduit for information between their fellow inmates and counsel; voicing the concerns of those who were not comfortable speaking for themselves; and participating in the mediation process to reach a final settlement. The court has been quite impressed with the poise and eloquence of Ms. Harley and the other representatives over the course of the litigation. There is a great deal of potential waiting to be unleashed once they finish serving their sentences.

Second, the court wishes to express its gratitude to Magistrate Judge Wallace Capel who ably shepherded the parties through the development of these agreements. These agreements are clearly the result of careful and arduous negotiation. Judge Capel's efforts to bring the parties together and maintain momentum toward a compromise were indispensable.

Finally, the court recognizes the leadership of Commissioner Kim Thomas in resolving this litigation.

Since the court found that it was unlawful to continue segregating HIV-positive prisoners, Commissioner Thomas has shown a clear commitment to bringing the ADOC into compliance with federal law.

The parties' stipulated order will be entered.

DONE, this the 30th day of September, 2013.


      /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE